## THE STATE ex rel. ST. LOUIS - SAN FRANCISCO RAILWAY COMPANY v. GEORGE D. REYNOLDS et al., Judges of St. Louis Court of Appeals.

### In Banc, July 22, 1921.

1. **CERTIORARI: To Court of Appeals: Evidentiary Facts.** In *certiorari* to a court of appeals based on conflict with prior decisions, the Supreme Court takes the evidentiary facts stated in the opinion of the Court of Appeals as the facts of the case. Where it is stated in said opinion that "there was evidence tending to show·that the speed of the train was not slackened until after deceased was struck" the Supreme Court will assume that said statement is true, although an examination of the testimony might weaken the conclusions of law reached by that court.

2. **NEGLIGENCE: Crossing Railroad: Danger Zone: Humanitarian Rule.** The railroad ran east and west, and for about a half mile west of the station the double tracks were straight; north of them was the station house or waiting room, and south of them was a platform where passengers boarded east-bound trains; deceased, two other ladies and two children were in the station awaiting the arrival of a local train, due to stop at 9:45 a. m., but late; at about ten o'clock a through-passenger train, not scheduled to stop at the station and running several hours late and at the rate of forty-five miles per hour, approached from the west, and hearing its whistle these five persons, supposing it to.be the local train, left the station and started across the tracks for the platform, and two of the women and the two·children got across, but deceased, who was just behind the others, was struck just as she stepped off the south rail of the south track; a second or two more and she would have reached a place of safety. When the train was 1320 feet west of the station, the engineer saw this group of five persons leave the station and start across the tracks, and realizing they were attempting to cross he gave the brakes a "service application," which is the ordinary method of stopping a train as distinguished from an "emergency application," which slows up and stops it more quickly and which, if it had been given, would have stopped the train within the 1320 feet. The acts of the parties indicated to the engineer that they knew the train was approaching, which carried with it knowledge of the fact that it was

approaching very rapidly. *Held*, that the engineer had a right to assume that deceased would stop before entering upon the south track, and the five persons were not passengers from the time they left the station, but, as to this non-stopping through train, the danger zone began, not at the doors of the station, but, practically, with the south track;' *and*, the Court of Appeals, in ruling that the five persons were passengers from the moment they left the station for the purpose of boarding what they supposed was the local train and that it was the duty of the engineer from that moment to do everything he reasonably could have done to stop or slacken the speed so as to prevent the accident, contravened Boyd v. Railway Company, 105 Mo. 371, and later cases, and its opinion is therefore quashed. The deceased was guilty of contributory negligence, and there was nothing in the facts which brings it within the range of the humanitarian rule.

*Held*, by WALKER, J., dissenting, that the facts of the case of Boyd v. Railway Company, 105 Mo. 371, are different from those in the instant case, and that the ruling of the Court of Appeals does not contravene the decision in that case, and hence the writ of *certiorari* herein should be quashed.

## *Certiorari.*

WRIT QUASHED.

*W. F. Evans, E. T. Miller*, and *A. P. Stewart* for relator.

(1) The ruling of the Court of Appeals that, although deceased, who was *sui juris*, knew the train was approaching, yet, since the engineer testified that when his train was a quarter of a mile distant he saw a group of persons leaving the depot and knew they intended to cross the track, they were from that moment in the danger zone, and it was his duty at that time to stop or slow up his train so as to prevent the accident, and that as there was evidence tending to show that he failed in this duty, the humanitarian doctrine applied, contravenes the ruling of this Court in the following cases: Kinlen v. Ry., 216 Mo. 145, 164; Pope v. Railroad; 242 Mo. 232, 239; Reeves v. Railroad, 251 Mo. 169, 177; Keele v. Ry., 258 Mo. 67, 78; Guthrie v. Rail-

road, 204 S. W. 185; Moore v. Ry., 176 Mo. 528, 544; Eppstein v. Ry., 197 Mo. 720, 733, par. (a); Boyd v. Ry., 105 Mo. 371, 379; Moody v. Railroad, 68 Mo. 470, 473; Laun v. Railroad, 216 Mo. 563, 580; Holland v. Ry., 210 Mo. 338, 351. (2) The ruling of the Court of Appeals that, since the engineer admitted that he knew the group of persons were going to cross the track from the time they left the depot building, and when the train was a quarter of a mile distant, he was not entitled to presume that persons who were *sui juris,* as was deceased, and who knew that the train was approaching, would not step from a place of safety into one of peril, or that deceased would stop and permit the train to pass, but that he was required at that time to make every effort to stop or slacken the speed of the train so as to prevent the collision, contravenes the rulings of this court in the following cases: Keele v. Ry., 258 Mo. 62, 79; Markowitz v. Ry., 186 Mo. 350, 358; Moore v. Ry., 176 Mo. 528, 546; Guyer v. Ry., 174 Mo. 344, 350; Van Bach v. Ry., 171 Mo. 338, 347; Boyd v. Ry., 105 Mo. 371, 380; Tanner v. Ry., 161 Mo. 497, 512; Reardon v. Ry., 114 Mo. 384, 405; Pope v. Railroad, 242 Mo. 232, 240. (3) The petition and plaintiff's main instruction being directly referred to in the opinion of the Court of Appeals, they become a part of the opinion for purposes of this review, and may be examined by this court. State ex rel. v. Ellison, 220 S. W. 498; State ex rel. v. Ellison, 176 S. W. 11. (4) The ruling of the Court of Appeals approving the main instruction given at the instance of plaintiff, which submitted the case on the theory of the humanitarian doctrine, but omitted to require a finding that deceased was oblivious to the impending danger as a predicate to a verdict for plaintiff, and holding it not to be reversible error to omit the element of obliviousness from said instruction, is contrary to the rulings of this court in the following cases: Kinlen v. Railroad, 216 Mo. 145, 164; Pope v. Railroad, 242 Mo. 232, 239.

289 Mo.—31

*Perry Post Taylor, Emil Mayer* and *Ben L. Shifrin* for respondents.

(1) We contend that to hold that the plaintiff made no case under the humanitarian rule would contravene controlling decisions of this court in the following cases: Maginnis v. Ry., 268 Mo. 667, 671, 678; Ellis v. Ry., 234 Mo. 657, 673, 680; Holmes v. Ry., 207 Mo. 149, 163; Holden v. Ry., 177 Mo. 456, 468; Tavis v. Bush, 217 S. W. 274. (2) There was good reason for the Court of Appeals to affirm the judgment of the circuit court; hence, such action should be upheld here. State ex rel. v. Reynolds, 270 Mo. 589, 601.

GRAVES, J.—*Certiorari* to the St. Louis Court of Appeals. Our writ was invoked in a case decided by that court, entitled Charles N. Martin v. St. Louis San Francisco Railway Company, wherein a judgment of $5,000 obtained by plaintiff in the circuit court was affirmed by the Court of Appeals. The action was one by the husband for the alleged negligent killing of his wife. All charges of negligence were abandoned except the negligence covered by the humanitarian rule. In other words the case in the trial court was submitted solely on the humanitarian rule. Relator urges many conflicts between our opinions and the opinion of the Court of Appeals, the particulars of which will be noted in the course of the opinion.

The evidentiary facts are thus outlined in the opinion of the Court of Appeals.

"At about 10 a. m. on August 6, 1917, plaintiff's wife was struck and killed by one of defendant's eastbound through-passenger trains at Shrewsbury Station, St. Louis County. Hence arose this action for damages under the Compensatory Death Act (Sec. 5425, R. S. 1909). All allegations of primary negligence were abandoned by plaintiff, and the case was put to the jury under the humanitarian doctrine, resulting in a verdict and judgment for plaintiff for $5,000. Defendant appeals.

"Defendant's double track runs east and west at the point, and for about one-half mile west of the station the track is straight and then curves to the south. West-bound trains use the north track and east-bound trains the south track. North of both tracks is the station house, and south of the tracks is a platform where passengers board east-bound trains.

"On the morning in question, a local suburban accommodation train was due to stop at Shewsbury Station at 9:46 a. m. This train was late. About ten o'clock a through-passenger train, not scheduled to stop at this station and running several hours late and at the rate of forty-five miles per hour, rounded the curve one-half mile to the west of the station and proceeded eastward on the south or east-bound track on a down grade of about sixty feet to the mile. At this time the deceased, Mrs. Martin, two other ladies, and two children were in the station on the north side awaiting the local train. Hearing a train whistle to the west, they proceeded out of the station and across the track for the purpose of getting upon the platform on the south side so as to take what they supposed was the local accommodation train that was approaching and which would stop at the station.

"The inference is plain from the evidence that this group of passengers, including the deceased, knew the train was coming down the grade, but supposed that it was the local train and it would slow up and stop at the station. In that event there was ample time to cross the track in safety. As it turned out, the train was a through train running very fast and not scheduled to stop. The result was that the two ladies and the children barely crossed the track in time, and Mrs. Martin, who was just behind the others, was struck and killed just as she stepped off the south rail of the east-bound track. One second more, or two at the most, and she would have reached a place of safety.

"The testimony of the engineer, who was called by the plaintiff, shows that this train of nine coaches was running on about the time of the local train which was passed by his train at Valley Park, twelve miles to the west; that as he approached the station traveling forty-five miles per hour and when about one-quarter of a mile (1320 feet) west of the station, he saw this group of passengers leave the depot and start across the tracks, and that he knew they were going to cross in front of his train. While the engineer says that he did not see the deceased until just before his engine struck her, he did see the group of passengers crossing the tracks, and other evidence is to the effect that Mrs. Martin was among the group. Realizing at that moment that these women and children were going to cross in front of his engine, the engineer testified he gave his brakes what is termed a 'service application,' which is the ordinary method of stopping the train as distinguished from an 'emergency application,' which slows up and stops the train quicker than the 'service application,' and which is used in cases of emergency. He says he took this action in order 'to give the group of passengers time to get across.'

"While the engineer testifies he applied the brakes as stated and lessened the speed of the train from a point one-quarter of a mile from the station, there was evidence tending to show that the speed of the train was not slackened until after the deceased was struck. There was further evidence tending to show that had the engineer given the brakes an emergency application instead of a service application, the train could have stopped within the 1320 feet under the condition that existed. In any event, by such emergency application the speed of the train could have been so slackened that the deceased would have had time to have escaped from the on-coming locomotive. While the engineer says that having once given the brakes the service application he could not thereafter, for mechanical reasons, apply the

emergency brakes, this is disputed by another experienced engineer who testified for plaintiff.''

Counsel for relator, after setting out the foregoing portion of the Court of Appeals' opinion and directing our attention thereto, then thus proceed to outline their conclusions of the rulings of the court:

''On this statement of facts, the Court of Appeals held:

''(1)  That when the engineer saw the group of people leaving the station for the purpose of going to the south side of the track to take what they supposed was the local accomodation train which he knew was following his train, and when he knew that they were going to cross the track, they were from that moment in the danger zone, and the duty then devolved upon the engineer to do everything he could reasonably do to either stop or slow up the train so as to prevent the accident, and that, as there was evidence tending to show that he failed in this duty, the case was properly submitted to the jury under the last-chance rule; and,

''(2)  That, since the engineer admitted that he knew the group of people were going to cross the track from the time they left the depot building, he was not entitled to presume that persons who were *sui juris* would not step from a place of safety into one of peril.

''The Court of Appeals further approved the main instruction given by the trial court at the instance of plaintiff, which instruction submitted the case to the jury on the theory of the humanitarian doctrine, but omitted to require the jury to find, as a predicate to returning a verdict for plaintiff, that deceased was oblivious to the impending danger.  The petition contained no allegation that deceased was oblivious to the impending danger.  The Court of Appeals held that it was unnecessary that the petition should contain an allegation that deceased was oblivious to the impending danger, or that the element of obliviousness should be incorporated in the instruction, because of the evidence

of the engineer, who admitted that he knew the group of persons, of which deceased was one, were going to cross the track in front of his engine.''

These holdings, they say, conflict with divers opinions of this court. This sufficiently outlines the case.

I.  Relator is correct in urging that the Court of Appeals ruled that the deceased was in the danger zone from the time she left the depot on the north side of the two tracks, and started to the south. On this question, the court said:

''When the engineer saw this group of passengers leaving the station for the purpose of going to the south side of the track to take what they supposed was the local accommodation train, which he knew was following his train; and when he knew, as he admits, that they were going to cross the tracks, they were from that moment in the danger zone, the duty then devolved upon him to do everything that he could reasonably do to either stop or slow up his train so as to prevent the accident.  As there was evidence tending to show that he failed in this duty, we think the case was properly submitted to the jury under the last-chance rule.''

It should be noted that the court further says that ''there was evidence tending to show that the speed of the train was not slackened until after the deceased was struck.''  From whence this evidence comes the court does not enlighten us in the opinion.

Evidentiary Facts.

Under our rule we take the evidentiary facts in the opinion for the facts in the case, and we shall follow that rule in this case.  Curiosity, however, prompted us to read the record in the Court of Appeals, and it there appears that the woman just ahead of the deceased looked up at the approaching train twice, and saw that it was coming very fast and was not slackening its speed. She was the leading witness for plaintiff. By other persons who were on the south side of the track awaiting this local train, it was shown that the speed of the train was not slackened, and that by the time the train

State ex rel. Frisco Railroad v. Reynolds.

covered half of the clear distance between the curve and the depot, they discovered that it was not the local by the very facts that it was running so fast and was not slackening its speed. What other waiting passengers saw, deceased might have seen. Of course these details, helpful as they might be, we cannot, and will not consider. We shall take the evidentiary facts just as they are in the opinion, although it might weaken the ruling of our learned brothers, if the actual facts, stated above, appeared. They did rule that the danger zone for the deceased began at the depot, and extended clear across the tracks. In other words they ruled that it was the duty of this engineer to begin the process of protecting deceased, as if in a perilous position, and oblivious thereof, from the time she emerged from the depot. Deceased was *sui juris* and possessed of all her faculties. Is this ruling in conflict with our rulings? Of that question next.

II.   The Court of Appeals says: "The inference is plain from the evidence that the group of passengers, including the deceased, knew the train was coming down grade." From the real record the word "inference" would apply to deceased rather than the others. This because her mouth was closed at the trial. The others testified, and we have indicated supra the character of their testimony. One went so far as to say that she discovered it was not the local train (by its speed) before she crossed. And she was just ahead of deceased. These facts we eliminate, however, and take the court's statement that "the inference is plain" that they knew of the approaching train. We also take the court's statement that the engineer knew that the purpose of these three ladies and two children was to cross those tracks. With both statements taken for the facts, we yet have those parties knowingly leaving a place of safety, and putting themselves in a place of peril. Concede that they thought it to be the local train, yet they were cross-

Danger Zone: Passenger: Humanitarian Rule.

ing railway tracks, one of which would be occupied by the engine of that train. They were crossing from the depot directly across to a platform opposite, as we gather the facts from the opinion. The engine of even the local train would have to cross their pathway, before its train would be in position to receive passengers. The deceased was, under all the facts, head-bound for a place on the railway tracks, which she knew would sooner or later be occupied by the moving engine of the train, whether it be the local train or some other train. Her duty was to see just where the moving engine was, and the rate of its speed, before she attempted to cross the track. This because, as the Court of Appeals finds, she knew the train was coming. She with knowledge of the fact of the approaching train was not *oblivious* of her danger. Now as to the situation of the engineer on the train. He saw these parties, and the track being clear and straight, he had the right to assume that they saw his train and the speed of the train. Their actions indicated to him that their purpose was to cross the track, but their actions also indicated that they knew (as the Court of Appeals finds) of the approaching train, and its speed. He knew that the local was behind him, and he had the right to assume that they, if waiting passengers, knew the local train had not arrived on time. In other words, that such train was off of schedule time. But the mere fact that these parties were going to cross the tracks would not necessarily indicate that they were intending passengers. The engineer had the right to assume (knowing from their acts that they saw his train, and hence the speed thereof) that these parties would look and stop before entering upon the track, the real danger zone. The mere fact that he might have believed, or even knew, that their purpose was to cross the tracks, and that too, before the arrival of his train, did not deprive the engineer of the right to assume that they would stop their progress before real danger was reached. This, because to him their actions disclosed their knowledge of his approaching train, which knowledge carried with it knowledge of the

fact that the engine was approaching very fast. The Court of Appeals says that the engineer would have no right to assume that these parties, with knowledge of an approaching train, the engine of which must cross their pathway, whether such train be the local or some other train, would cease their progress across the tracks, before placing themselves in actual danger by going upon a railroad track immediately in front of a rapidly moving engine. Once you concede that the parties had knowledge of the approaching train, and that there were acts to indicate to the engineer that they had such knowledge, then there is no danger zone until the track is practically reached. This for the reason that the engineer can assume that approaching parties (knowing that the train was coming) would stop before going on the track, rather than hurl themselves upon the track directly in front of the rapidly moving train. This assumption, the Court of Appeals ruled, was not proper, and that the danger zone began at the depot. In this they contravene our cases.

The ruling clearly conflicts with Boyd v. Railway Co., 105 Mo. 371, and the many cases which have followed that case. The facts of the Boyd Case are in many ways similar to the case at bar. The Court of Appeals make an attempt to distinguish it from their case, but it cannot be successfully done. Judge BRACE has succinctly stated the facts of Boyd's Case, at page 378, thus:

"The evidence for the plaintiff disclosed the following facts: Charles Boyd, the husband of plaintiff, was a hotel keeper in the town of Renick in Randolph County. His hotel was situated about one hundred feet north of the depot. The defendant's tracks are between the hotel and the depot. A plank walk leads from the hotel across the tracks to the platform of the depot, and was used as a public crossing. In the prosecution of his business, he was in the habit of going to the depot upon the incoming of all passenger trains stopping at that station. One of defendant's regular passenger trains, the mail from Kansas City to St. Louis, was due from the west at

Renick daily at 12:30 p. m., and usually passed over the crossing from the hotel at a speed of three or four miles an hour, stopping at the platform just east of the crossing.

"On the twenty-sixth of September, 1887, an excursion train approached Renick from the west on the time of the Kansas City and St. Louis mail, and running as its first section; it signaled its approach by whistling at the usual place. The train from the time it whistled until it passed the depot, at which it did not stop, was running at about forty or forty-five miles an hour; as the train approached the depot its bell was rung, and kept ringing, but its speed was not checked. When Mr. Boyd heard the train whistling he was in the house; he immediately came out and started for the depot on the plank walk in a run or 'trot' and without breaking his gait entered upon the track immediately in front of the engine and was struck just as he was about to make his last step over the track, and instantly killed. Mr. Boyd was a small, active man, quick in his movements, about fifty-two years of age, and in the enjoyment of all his senses. The train was in plain view, and its sound in his hearing from the moment he started from his hotel, on the plank walk, until he entered upon the track. That he both heard the train and saw it, in a general way, there is no question; but he did not stop a moment in his course to observe its movement, to ascertain whether it was the regular train he was expecting, and which would stop at the depot, and whose speed as it slowed up for that purpose he could accurately gauge from his long and frequent experience, or, as it proved to be, a special going at a high rate of speed and showing no evidence of an intention to stop; dominated perhaps by the first impression received in the house when he heard the whistle, that this was the regular mail, he hastened towards the depot and onto the track without stopping for a moment to test by sense of sight or sound the correctness of his first impression, and as the result of his heedlessness lost his life. This is one view of the case presented by

plaintiff's evidence, as through it we look back at the unfortunate accident after it happened; another may be taken of it, that observant of his surroundings he may have miscalculated his own speed and that of the train, and hazarded the chance of getting across the track in safety before the engine could strike him. In either view his death was the result of his own negligence.

"The evidence for plaintiff further showed that the deceased in going from his hotel to the track was in plain view of the defendant's servants on the locomotive, and there was evidence tending to prove (upon the hypothesis that the train was going at the rate of forty miles an hour) that, if the engineer had commenced checking his train at three hundred feet from the point of collision, the speed of the train could have been so diminished that it would have reached that point two seconds later than it did, and deceased would have escaped without injury."

There is every material fact in that case, that there is in the case under consideration. It is true that Boyd was not an intending passenger, but his purpose to get to the depot where his expected train would stop is the same. In Boyd's case, the deceased was running to get over the track to the depot; the engineer saw him or could have seen him in time to have so checked his train as to have avoided injury; Boyd was in view from the time he left this hotel, and his acts showed that he intended to reach the depot across the tracks, just as the acts of these parties showed that they intended to reach the platform across the tracks; Boyd knew there was a train coming, but thought it to be a train which was then due to stop there, as did these parties think; Boyd was killed by an extra train running forty to forty-five miles per hour, which was not to stop, as was deceased killed in the case before the Court of Appeals. The facts are so near indentical, and so very similar, that the same principles of law must be applied to each.

The Boyd Case ruled that the danger zone was the railroad track, and further ruled that, although the engineer saw Boyd running toward the depot, the engineer

had the right to assume that he would check his progress before going upon the railroad track. We also then ruled that the plaintiff's evidence did not make a case for the jury upon the humanitarian rule, or any other rule, and reversed the judgment for plaintiff, which was rendered under her instruction covering the humanitarian rule. The doctrine of Boyd's case has been consistently followed by this court (as the Missouri Citator will show), but we shall not stop to compare the other cases with the facts of the present case. The curious may examine Kinlen v. Railroad, 216 Mo. l. c. 158; Holland v. Railroad, 210 Mo. l. c. 351; Sites v. Knott, 197 Mo. l. c. 712-713; Mockowik v. Railroad, 196 Mo l. c. 570; Boring v. Street Railway Co., 194 Mo. l. c. 549. [See, also, Laun v. Railroad, 215 Mo. 563; Pope v. Railroad, 242 Mo. l. c. 239-40; Reeves v. Railroad, 251 Mo. l. c. 177-8; Keele v. Railroad, 258 Mo. l. c. 78-79; Guthrie v. Railroad, 204 S. W. 185.] Boyd's Case is so similar in facts, that without departing from the rules announced in it we cannot sustain the judgment and opinion of our learned brothers of the Court of Appeals.

III. There are two or three other alleged conflicts between the opinion of our learned brothers and our opinion, but we are so thoroughly satisfied that their opinion conflicts with Boyd's Case, and all of the cases following it, that we shall not go further. A discussion of these alleged conflicts would serve no good purpose in view of what we have just ruled. We might add, and properly so, that under our ruling in Boyd's Case, the opinion of the Court of Appeals is wrong and conflicting in holding that, under the facts shown, the plaintiff was entitled to have his case go to the jury. We reversed Boyd's Case because wrongfully submitted to the jury on facts fully as strong for the plaintiff there as are the facts for the plaintiff here. So the opinion conflicts wherein it says that defendant's demurrer to the evidence was properly overruled by the trial court. Under these views review of other alleged

*Other Conflicts.*

conflicts can serve no purpose, because the Court of Appeals, following our views in this opinion, will have to reverse absolutely the judgment *nisi*.

The judgment and opinion of the St. Louis Court of Appeals, for the reason stated, is quashed.

All concur, except *Walker J.*, who dissents in opinion filed; *J. T. Blair, C. J.*, concurs in result.

WALKER, J. (dissenting).—The facts in the Boyd Case, as I read them, are different from those in Martin v. Railroad. In my opinion, the ruling of the Court of Appeals in that case does not contravene the opinion in the Boyd Case, and hence our writ should be quashed; which conclusion results in my dissenting from the majority opinion.