JAMES CARNEY v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY and HORACE DAVIDSON, Appellants.—23 S. W. (2d) 993.

Division One, July 30, 1929.

Luther Burns and Culver, Phillip & Vorhees for appellants.

*Pross T. Cross, R. H. Musser,* and *Gerald Cross* for respondent.

480

LINDSAY, C.—The plaintiff brought this suit to recover the statutory penalty for the alleged wrongful death of his wife Rose Carney, and of his infant son Lawrence Carney, who were killed on August 25, 1925, at the station of defendant in the town of Turney, Clinton County, as a result of being struck by an engine owned by defendant railway company and operated by defendant Davidson as engineer. Plaintiff had a verdict on the first count of his petition in the sum of $8,000 for the death of his wife, and a verdict in the sum of $5,000 on the second count for the death of his child. The questions raised require a description of the place and circumstances of the occurrence.

The tracks operated by defendant through Turney run north and south. The engine in question, with the train of cars attached, came from the north upon the main track along and next to the west side of the depot platform. Immediately west of this main line track and distant from it eight feet and six inches is a switch track referred to as the "middle track." At about the same distance west of the middle track was another north-and-south track referred to as the west track. The distance from the depot platform to the west rail of the west track is thirty-four feet. Immediately west of the west track is a park or open place, 180 feet wide. On the west side of the park is a street running north and south, which is thirty feet wide; and there are several business houses along that street facing toward the park and the depot. A brick sidewalk extends across this street, and eastward across the park, and merges into a cinder walk which crosses the three tracks to the station platform. There is a band stand in the park about ninety feet west of the west track. The main track is straight for a long distance and practically level, and all the testimony was that there was nothing to prevent the engineer of a train approaching the depot from the north, from seeing a person approaching the tracks from the west upon the walk; and there was nothing to prevent such a person from seeing an engine and train approaching from the north. The accident occurred at about 1:40 P. M. The plaintiff and his wife lived in Lathrop, a town a few miles south of Turney, and on the day in question, she, with her three children, was expecting to take a local train of the Burlington Railway to go from Turney to Lathrop.

The tracks mentioned are used by defendant railway and also by the Chicago Burlington & Quincy Railway, and the train plaintiff's wife expected to take was a local passenger train spoken of as the Burlington No. 3, to come from the north upon the main track, and due to arrive at 2:24 P. M.

The train which killed the plaintiff's wife and child, was a fast train running from Minneapolis to Kansas City. It was due at Turney at 1:19 P. M. and on this occasion was a few minutes late, reaching Turney at 1:40 P. M. Plaintiff's wife had lived all of her life near Turney; before her marriage had worked there, and visited there frequently, and was familiar with the town, railroad station and tracks. On this occasion, accompanied by her three children, Melvin, aged seven years, Velva, aged five years, and Lawrence, two years and nine months old, she went into the station building and bought tickets for the Burlington No. 3 local train. She then went to what was spoken of as the Farmers' Store, upon the street on the west side of the park. This store is a short distance north of the walk. She bought ice cream cones for the children, and they started back toward the depot. At that time defendant's fast train was approaching the station from the north on the main track. It was not scheduled to stop at Turney, and was travelling at a speed of approximately fifty miles per hour. The whistle was sounded for the crossing at some distance north of the station, and at that time Mrs. Carney and her three children were on the walk and going toward the depot. About that time they hastened their steps; the two older children began running, and Mrs. Carney, taking the infant up in her arms, also began to run along the walk, east, toward the depot. She was a large woman and was somewhat encumbered by carrying the child in her arms, so that, the two older children ran more rapidly, crossed the tracks, and reached the depot platform, and were not struck. The west end of the beam of the engine struck Mrs. Carney as she came near the main track, and she and her infant son Lawrence were killed.

The evidence showed that after the two older children reached the platform, they started to turn back onto the track, and were seen by defendant's station agent, who pulled them from the main track back onto the platform, at risk to himself and barely in time for their escape from being struck by the engine. An outstanding issue in the case is whether Mrs. Carney's action in running across the middle track and upon or near the west rail of the main track, was caused by her seeing that the two older children were attempting to turn back from the platform onto the track and whether her action, in going to the main track, was an effort to reach them, and rescue them from the peril in which they were. The appellants contend there was no evidence to show that Mrs. Carney ran to the

main track to save the two older children. It will be necessary to consider the evidence upon this point more fully, also certain other matters in testimony, in connection with the issues here upon the appeal.

The plaintiff, in each count, pleaded an ordinance alleged to be in force in the town of Turney, which forbade the running of a locomotive engine or train at a greater rate of speed than fifteen miles an hour. Each count of the petition set up two grounds upon which recovery was asked. Essentially, the theory of one ground was, that defendants were negligent in running the train at an excessive speed in violation of the ordinance, and that Mrs. Carney was not guilty of contributory negligence, although she voluntarily went upon the main track, because she did so in an effort to rescue the two older children from impending peril. The other theory and ground of recovery stated in each count was a violation of the humanitarian rule, in that, defendant and its engineer and fireman, although they saw Mrs. Carney and said infant children in, or going into, a position of peril, in time to have stopped or checked the speed of the train and to have avoided striking plaintiff's wife and child; and saw, or could have seen, that Mrs. Carney was attempting to rescue the two older children who were in or going into a place of peril, and were small and below the age of discretion, in time to have stopped the train, or checked its speed, and prevented striking her, and the infant child, they negligently failed either to stop, or check the speed of the train or sound a warning. The answer to each count contained a general denial and plea of contributory negligence of Mrs. Carney in that she walked in front of the train without indicating that she did not intend to stop before going on the track. The court overruled defendant's demurrers offered at the close of the case, and submitted each of the counts to the jury on the two theories. This was done by plaintiff's instructions numbered 3 and 4 authorizing a recovery. The defendants assign error on various grounds in the giving of these instructions, and also assign error in the refusal of certain instructions offered by them; and error is assigned in the overruling of the demurrers. In large measure, the objections to the instructions for plaintiff are based upon the claim there was no evidence of a fact, or facts, hypothesized therein. The general claim made under the demurrer includes the challenges of want of proof made respectively against the plaintiff's instructions.

We take up the questions in the order in which they are discussed by counsel for appellants, and consider plaintiff's Instruction 4. The instruction is long, but it is not necessary to set it out in full. The substance of the instruction was that the ordinance of the town

of Turney limiting the speed of trains to fifteen miles per hour was valid, and defendants were guilty of negligence if they ran the train in question in excess of that speed; that if the plaintiff's wife and child were struck and killed by that train and said negligence was the direct and proximate cause of the striking and killing of plaintiff's wife and child Lawrence, and plaintiff's wife was herself guilty of no negligence, then the plaintiff was entitled to recover, on the first count for the death of his wife, and on the second count for the death of his child. This Instruction 4, in proceeding to authorize such verdict, further required the jury to find: that plaintiff's wife at and prior to the time the train struck her and her infant child, was exercising such care for her own safety as a person of ordinary prudence would have used under the same circumstances, and that when she went upon the track in the path of the train she held her infant child Lawrence in her arms, and that the other two small children were on or very near to the track and in imminent danger of being struck and killed by the train, and that she saw and realized their peril and that their danger, if any, was caused by the negligence of defendants in running the train at a rate of speed in excess of fifteen miles an hour; and that plaintiff's wife went upon the track in an attempt to rescue her said children from the threatened peril, and that an ordinarily prudent person acting under the same circumstances would have gone onto the track, and in front of said train, in an attempt to rescue the two children from their peril, if any.

The objections made by appellants do not go to the mere form of the instruction, but their attack is essentially upon the ground that there was no evidence to sustain certain of the elements upon which liability was predicated by the instruction. They say the ordinance was a void ordinance, because it did not provide for a penalty for a violation of it; that the only act of negligence which was submitted as causing the peril of the two children, was the violation of the void ordinance, and the ordinance being void there was no negligence shown; and that Mrs. Carney was guilty of contributory negligence as a matter of law in going upon the track as she did, when she saw the engine approaching and so close to her that it struck her before she got across, and was guilty of contributory negligence even though she did go upon the track for the purpose of rescuing her children, because, the attempt to rescue the children, if made, did not absolve her from negligence, unless the peril of the children was caused by the negligence of the defendants. Joined with the foregoing is the claim that there is no substantial evidence that Mrs. Carney went upon the track in an attempt to rescue her children.

The first question therefore is whether the ordinance was void, or may be assailed as void, on the ground that it provided no penalty for its violation.

Counsel have cited authorities to the effect that by-laws or ordinances must be held to be inoperative or useless, unless some penalty be annexed for the breach of them. [1 Dillon on Municipal Corporations (3 Ed.) sec. 336; 43 C. J. 551, sec. 860.] They also call attention to authorities in cases arising in other jurisdictions. Clearly, if the ordinance must be held void for want of any penalty for its violation, then defendants can not be held guilty of ordinance negligence as submitted by this instruction. The immediate question is whether defendants may avail themselves of the claim that the ordinance is void. The ordinance was pleaded as in force, and Section 1, fixing the speed limit for trains in the town of Turney, was set out in full in both counts of the petition. A cause of action founded upon the ordinance was pleaded. The answer made no reference to the ordinance. In Roper v. Greenspon, 272 Mo. 288, in Court en Banc, an ordinance was pleaded in the answer. Its validity was not challenged in the reply. It was said at page 296: "We take it that the validity of an ordinance, like the unconstitutionality of a law, must be brought in at the first open door under the orderly procedure in the case. [Lohmeyer v. St. Louis Cordage Co., 214 Mo. 685.] If the cause of action be founded upon a pleaded ordinance, the answer would be the first open door. If the defense in its answer relies upon the pleaded ordinance, then the reply would be the first open door. So that we conclude, as both opinions of the Court of Appeals conclude, that the invalidity of this ordinance is not in the case." The case was one certified to this court by the St. Louis Court of Appeals.

It is proper also to notice the circumstances under which the ordinance was offered and admitted in evidence. Counsel for plaintiff asked to be allowed to introduce in evidence Section 1, General Ordinance No. 22, of the town of Turney, as it appeared in the printed book of the ordinances of the town of Turney, showing the date of its passage and approval, and its attestations, and further said: "And in continuation of the same offer we offer a duly certified copy of General Ordinance No. 22, including Section 1, duly certified by N. W. Pulliam, clerk of the board of trustees of the town of Turney, attested with the seal of the town of Turney." The court inquired if there were any objections. Counsel for defendants then stated: "We object to the printed copy for the reason that it is not properly authenticated, and we object to the type-written copy for the reason that it is incompetent, irrelevant and immaterial, unreasonable and void." The court ruled that it be considered in

evidence. Section 1 was then read. The whole of the ordinance, showing on its face its contents, was in the hands of counsel for objections, but defendants contented themselves with the general objection we have set out. The full ordinance is not before us. Counsel for plaintiff state in their brief that Section 7 contains provision for a penalty for violation of its terms. If the ordinance was in fact subject to the objection now made, the trial court should have had opportunity to pass upon the precise question involved. [Jones on Evidence, Civil Cases (3 Ed.) sec. 893.] The objection made was too vague and general, to be the basis of review on appeal or to convict the trial court of error in admitting the ordinance in evidence. In 38 Cyc. page 1385, after giving utterance to the rule that objections should be specific, it was said: "So a general objection raises no question as to the validity of an ordinance offered in evidence." While only Section 1 was read, and only that section shown in the record here, the whole ordinance was offered and submitted to counsel for objections, and if it contained no provision for a penalty, that fact would have been apparent. Having failed to challenge the validity of the ordinance by answer, and having failed to point out to the trial court the lack of provisions for a penalty, if that were so, we rule the question of invalidity of the ordinance is not before us.

Under the evidence, it was shown beyond any dispute, that the two children were in imminent peril, and all the evidence shows the train as it approached the depot was running at a speed of approximately fifty miles an hour. It is true, as contended, by defendants, that the attempt of Mrs. Carney to rescue the children if she made such attempt, does not absolve her from negligence unless the peril of the children was caused by the negligence of the defendants. "To justify a recovery for injuries received in an attempt to rescue another from a position of peril, it must be made to appear that the perilous situation of the person attempted to be rescued was produced by the act of the defendant. Thus, where the injuries complained of appear to have been sustained in an attempt to rescue another from an approaching train, it must be further shown that the railroad company was negligent in so operating the train as to imperil the persons attempted to be rescued." [20 R. C. L. 132, sec. 109.] The same rule is stated in Donahoe v. Railroad, 83 Mo. l. c. 563; Eversole v. Railroad, 249 Mo. 523, 539. Holding as we do that the question of invalidity of the ordinance is not before us, that the speed shown was greatly in excess of that allowed by the ordinance, and that the evidence showed the two children were in a position of imminent peril, we further hold that it was proper to submit to the jury the question whether the imminent peril of plain-

tiff's children was caused by the negligence of defendants in violating the ordinance.

The engineer saw the two children, and their mother somewhat behind them, running toward the depot, when his engine was 500 or 600 feet from the depot. He did not know the relationship between them, but he saw that they were small children, and, seeing them near and running toward a point which his engine was approaching at such great speed, a greater degree of care was required of him than if they had been grown persons.

Under the circumstances he had no right to presume that the small children would keep out of the way of danger, or that if they succeeded in crossing the track, they would remain at a safe distance. [33 Cyc. 802; Livingston v. Wabash Railway, 170 Mo. 452.] The engineer made no effort to check the speed of the train until his engine was almost at the depot.

The question whether there was evidence that Mrs. Carney attempted a rescue of her children requires further notice of the testimony. Curtis Holland, plaintiff's witness, testified that he was standing at the door of the Farmers' Store where the ice cream cones were purchased by plaintiff's wife, which is north of the walk leading to the depot. He saw plaintiff's wife and children as they left the store and went south to the brick sidewalk, going thence eastward on the walk and cinder path leading toward the depot, and saw the two children start running toward the depot; heard short whistles, a number of them, as they started to run. He said the mother of the children, when they started to run picked up the little one and ran after them; that she got up to about thirty feet, or less, of them. The witness said the children got to the depot platform, but he could not tell just how they did, because, as he said: "At the time when this train first came, it looked like the two of them were right on the track;" that he saw Mr. Emerson, the station-agent, rush out on the platform and grab the two children; that one of them seemed to be right between the east rail of the main line and the platform, and the other one seemed to be right in the middle of the main track. He was asked how far the train was from them when Emerson grabbed them off the rails. He said: "I couldn't say; it was so close I wouldn't have wanted to be in his place myself." Asked where Mrs. Carney was, when the children were grabbed from the rail, he said: "She was pretty near them then; she was about at the east rail of the middle track." He viewed the situation from a slight angle, being, as stated, north of the path on which the children and their mother were running.

Van Williams, plaintiff's witness, testified that he had just stepped out of a store door, which seems to have been next to or near the Farmers' Store, and heard the locomotive whistle; that he saw

Mrs. Carney and the children; that they were going toward the depot; that she was a little beyond the band stand toward the depot, and the children were ten or fifteen feet ahead of her, and they were running, and the mother was running also. He said he head the first of the blasts of short, sharp whistles when the engine was north of the stations near the elevator, something like 400 feet north of the depot. He did not see the station agent catch hold of the children and pull them back, but he saw them after the train passed.

Ed Hockensmith, plaintiff's witness, testified he was at the Farmers' Store; that after the ice cream was purchased he saw the two children and the plaintiff's wife running toward the depot; that she was walking until she got about to the band stand; she then picked up the little one and started to run; that she kept that up until she was struck and killed; that he heard the sharp blasts of the whistle; that these sharp blasts began up above the station, probably four or five hundred feet. On cross-examination he said the children "kinda played along ahead of her until she got past the band stand, and the lady picked up the little one and she started to run;" that he did not see the two children after they passed over the track onto the platform, because the train was in his way, and did not see the station-agent pull them away from the tracks; that when the mother entered upon the west track, the children were probably fifteen or twenty feet ahead of her; that neither the children nor the mother stopped running.

Earl Emerson, defendant's station-agent, introduced by plaintiff, testified that he was in the station on the north side of the office watching the signals at the west end of the yard, by which he could tell the train was approaching; that he rose up to close the north window, and he then saw the mother and the children, and the children were about the middle of the center track, and running east; that he then moved over to the south side of the office and could just see the top of their heads at the platform, and by the time he got over there (to the south side of the office) they had stepped up on the platform, at least he thought they had; that they seemed to turn around, and start back, and that was when he went out there and took them off the track; that he rushed as fast as he could to them. He said that when he reached them, one of them was between the station platform and the first rail of the main line, and the other was standing on the curb on the outside of the platform; that the projection or clearance part of a train was even with the outside of the platform. He was also asked:

"Q. How many feet, say, was the train when you snatched the child out of the path of it? A. Not much farther than from me to you.

"Q. That is about . . . What is that? That is about five or six feet then? It is your best judgment that the train was within five or six feet of the point where the child was standing, when you snatched it off the rail? A. By the time I got the child in the clear.

"Q. Now, do you say the mother was just on the opposite side of the track when you snatched the child up? A. I wasn't looking at the mother, but I had seen her; wasn't looking at the mother at the time I grabbed the child. At the time I took the child off the track, I didn't pay any attention to the mother."

He testified that at the time he saw the mother and children she was twenty-five to thirty feet behind the children; that when he went out to get the children from the platform, he didn't notice their mother; that the last time he noticed her was when he left the office. He had been sitting in the bay window on the west side of the building and thence went through the door south of the bay window and across the platform.

Christine Gordon, plaintiff's witness, was at the Farmers' Store; saw the children ahead of their mother about ten feet; heard the train whistle for the first north crossing, and saw the children start running; the mother picked the baby up in her arms and started running after the children; the children were running to the depot; "They ran across the depot and started back." She said she saw Mr. Emerson rush out and grab the children; judged that the mother was on the center track when Mr. Emerson grabbed the children. This witness, on cross-examination, testified that the children had started running several feet before their mother began to run; that the mother started running when the engine whistled up at the point where the passing track enters upon the main track. She also said: "I don't believe she started running when the first whistle blew, but when it commenced whistling several short blasts, then she started running."

R. R. Munson, another witness for plaintiff, testified that when he first noticed the mother and her children, the mother was "a little ways east of the band stand, and the children were aways ahead of her, and they were all running." That the children appeared to be fifteen or twenty feet ahead of their mother.

Herndon Holland, another witness for plaintiff, testified that when he first saw them, the mother was bending over picking the two-year-old child up in her arms; and the children were then in the middle of the middle track. He testified that he saw the children get on the platform, and saw them start back, and saw Emerson pull them back from the track; that the mother was running when Emerson came out to get the children. He said: "Just as Emerson

started out of the depot, she had started toward the other two children;" she had picked up the little child and had it in her arms and was running toward the platform, when he saw Emerson come out of the door; that she started before Emerson did.

The defendant Davidson, the engineer, testified that he saw the woman when she was following the children and the children were running toward the depot; that when he first saw them the children were just coming onto the "second passenger track." In his deposition taken by plaintiff, he testified they were about sixty feet from the depot platform when he first saw them, but corrected that afterward with the statement it was thirty-six feet; that when he first saw the two children running, his engine was about 600 feet north from the point where plaintiff's wife was struck. He testified that after he saw them, he gave the whistle signal; short blasts of the whistle. He testified upon the trial that he saw the children pass over the main track to the platform; that the woman was a short distance behind them, still running. He said: "She slackened up there for some cause, but I didn't know why;" that he saw no "indication in her movements that would indicate that she was not going to stop before she reached the track;" he applied the air and the emergency at the time he realized she was not going to stop; just how close she was he didn't know, "but it was close."

The defendant's witness Forrest Bennett said that he was at the elevator that has been mentioned, which was 390 feet north of the depot, and on the east side of the tracks; that at his first observation of the woman and children they were running, and "the two older children were about five or six feet back of her;" that they continued running; that the woman stopped three times on the way to the accident to pick up the child she had in her arms; didn't stop dead still, but checked her speed—pulled the child up in her arm; that the two older children "went on the platform and back of the window . . . bay window;" that he saw them going "across the track and upon the platform and over to the building behind the bay window." He further testified that he noticed the woman while she was approaching . . . She had crossed the middle track and was between the middle track and the main track, and then the two children appeared out there on the platform, and one of the children had started to step down on the east rail of the main line, and the other one was standing on the edge of the platform when the agent pulled them back; that when the mother got over the middle track the train obscured his view of her; that she was between the middle track and the main line when Emerson grabbed the children.

Otto Hereford, the fireman, testified that he saw the two children go across the platform, and go out of sight in behind the bay window; that the engine was then about 200 feet north of the depot. He said he saw the two children "start back, and the operator reached out and grabbed them;" that at the time the operator grabbed the children, the engine "was right on the depot platform." The platform was twelve feet wide. The lowest estimate of the speed of the train was 45 miles per hour. At that speed it moved 66 feet per second and if going 50 miles an hour, as the testimony tended to show, it moved seventy-three feet per second.

Counsel for defendants argue that the only reasonable inference to be drawn from the testimony is, that when Mrs. Carney heard the whistle of this train she thought it was the Burlington local, and ran to reach the depot ahead of the train, and that under the circumstances shown she was not running to prevent the two children from going upon the track. There is no evidence in the record that she called to the children to stop. There is no means of knowing absolutely what she thought in the few seconds in which she was going toward the tracks, but if she did think the train was the Burlington local at the time she started running, and that she could cross the track ahead of it, that is not conclusive of what her purpose was in continuing to run until she came so near the west rail that she was struck. She was directly behind the two children, and under the testimony not more than fifteen, twenty or thirty feet from them when they crossed the main track. They went upon and over the platform, and then turned back toward the track. Their movements, observed by the station agent at this time from the inside of his office, were such, that he realized their great peril, and rushed out to save them. There is testimony from which the inference could reasonably be drawn that before they turned back toward the track, Mrs. Carney checked herself somewhat, but that immediately and when or just before the agent ran out, she went forward again. The speed of the train was so great, the peril so imminent, that as the agent rushed across the platform to grab the children, he paid no attention to her and did not see her, although by the time he reached the children she must have been on the other side of the main track, opposite to him, and near the west rail. A reasonable inference is that Mrs. Carney saw the peril which the agent saw and at least as soon as he, and also, that being encumbered with the child she could not move as swiftly as he did. She was struck by the west part of the beam of the engine. If, as the agent estimated, the engine was no more than six feet away when the child at the east rail was withdrawn from the reach of the engine, Mrs. Carney on the other side of the track, and running, had the small fraction of a sec-

ond of time, to realize that the children were rescued, and to check herself, before coming in reach of the beam of the engine. Upon the demurrer, and upon the immediate question whether Mrs. Carney attempted to rescue the two children, the evidence favorable to plaintiff must be considered, and the reasonable inferences to be drawn therefrom are to be allowed. We overrule the contention that there was no substantial evidence that Mrs. Carney was struck in an attempt to reach and rescue the two children, and hold that the question was for the jury.

Counsel for plaintiff have presented at length the claim that Mrs. Carney was not negligent, although not attempting to rescue her children, upon the theory, that having knowledge of the ordinance, she had the right to expect that the train would not be running at a greater speed than that fixed by the ordinance, and cite numerous cases: Mason v. Railway, 246 S. W. 318; Strauchon v. Railway, 232 Mo. 587; Moon v. Transit Co., 237 Mo. 433; Harrington v. Dunham, 273 Mo. 414, and other cases. It may be conceded that such is the rule, in the absence of knowledge to the contrary by the party going upon the track. Such a presumption has no place when the evidence shows knowledge. Counsel argue that if plaintiff's wife was unable to judge the speed of the train or that she misjudged its speed, she was not necessarily negligent as a matter of law. In cases of this character the determination of the question depends upon the facts of the particular case. The angle from which the approaching car or train is seen by the person going toward the track, the speed at which it is moving, whether there are obstructions to the view, and other matters affecting the ability to judge of the speed of the train, are important factors. Cases are cited in support of the view that Mrs. Carney being dead, there is the presumption that she was in the exercise of ordinary care for her own safety. [McDaniel v. Hines, 239 S. W. 471; Tibbles v. Chicago & Great Western Railway, 219 S. W. 109; Allen v. C. B. & Q. Railway, 281 S. W. 737.] But, while counsel in their argument press the point under immediate consideration and cite many authorities upon various hypotheses, the printed statement of the case nowhere undertakes to state any facts as the basis of a claim that Mrs. Carney did not know the speed of the train was very great. On the contrary, in their statement, they emphasize facts tending to show she must have known the train was proceeding at a high rate of speed—as their statement that "the train when 600 feet or more away gave forth a continued series of sharp, piercing whistles known as danger whistles, . . . kept up until after the accident." After statement of that fact, there follows their statement of the action of Mrs. Carney: "The mother seeing her children running toward the track, and seeing and

492

hearing the train coming at a terrific rate of speed, grabbed the two-year old babe up in her arms and ran with all her might to the two children trying to catch them before they got in the path of the moving train.''

The other statements following, are on the theory that the mother, because of the short distance the train was away and its high rate of speed, realized the peril of the children and sought to rescue them. Under the evidence in this record, Mrs. Carney cannot be acquitted of contributory negligence on the theory that she did not realize the speed of this train and the danger in going to the track, but as heretofore indicated, we are of the opinion that under the evidence a submissible case was made on the theory that the children were in peril caused by the negligence of defendants, and she realized their peril, and went forward in an effort to rescue them. It was proper for the court to submit those questions to the jury, under the charge of primary negligence against defendants.

The next complaint made by defendants is the giving of plaintiff's Instruction 3, which submitted the case under the humanitarian doctrine and authorized a recovery under the first count, for the death of plaintiff's wife, and a recovery under the second count for the death of the child. It is first insisted that the instruction should not have been given at all. This is put upon two grounds. First, it is urged that Mrs. Carney was not in imminent peril within the humanitarian doctrine, because, there was no evidence she went upon the track in an attempt to rescue her children. This embodies a claim that the evidence shows that before she went upon the track she was not oblivious to her peril in doing so, but had full knowledge of the approach and nearness of the train, and had the ability to stop before going on the track; nevertheless, went on. Claiming there is no evidence she went on the track in an attempt to rescue her children, counsel say the case is within the rule announced in Clark v. Atchison, Topeka & S. F. Railway, 6 S. W. (2d) 954, 960; and also within the rule, and application of the rule made, in State ex rel. v. Reynolds, 289 Mo. 479; Boyd v. Railway, 105 Mo. 371; Sullivan v. Railway, 297 S. W. 945, and other like cases, in which it was held that where it was conceded or conclusively shown that the person knew or could have had full knowledge of the approach of the train and of the danger, and could have avoided the danger, and did nothing to indicate want of knowledge, or of an intention to go forward until it was too late for those in charge of the train to avoid inflicting the injury, there could be no recovery under the humanitarian doctrine. We have held that there was evidence to go to the jury upon the question whether Mrs. Carney went on in an attempt to rescue her children. The other inquiry under the evidence, is

whether defendants saw or should have seen her about to go into a position of imminent peril, in time, by the exercise of ordinary care, to have avoided striking her and the infant child. The engineer testified that he saw the two children running along the cinder path toward the depot, when his engine was in the neighborhood of 600 feet away, and saw the woman running after them, and he saw that the children were small. He says that at the time he saw the children, they were upon the middle track. He, at that time, had just begun giving, or immediately thereupon began to give, a series of short, sharp whistles, which continued until the engine struck Mrs. Carney. His statement is that he saw the children pass over the main track to the platform, and that the woman was just a short distance behind them and still running. Asked if she stopped at any time, he said: "She slackened up there for some cause, I don't know why . . . I only noticed once that she turned her head and I thought when she did that she seen me or seen the approaching train." On the other hand there is evidence tending to show that Mrs. Carney, after she first picked up the infant child and started running, did not stop running or slow up her speed.

The witness Curtis Holland was asked in his direct examination whether at any time she slackened her speed, after she started running and until she was struck. He said: "No sir, she did not; that I noticed."

The witness Hockensmith, on cross-examination, after stating that she and the children ran, said she continued running and "did not stop running until she was struck by the train."

As to the two children, the instant they were seen about the middle track running toward the main track "both danger and duty began." [Cytron v. Transit Co., 205 Mo. 720; Sherman v. United Railways, 202 Mo. App. 39, 53.] As to these two small children it was a danger not confined solely to the question whether they would clear the track itself, but whether having done so, on account of their lack of discretion, and the circumstances that their mother was running after them toward the same point of the track, they would remain in a place of safety, if reached, or would turn about toward the track they had crossed. The question here is whether, under this evidence, that favorable to the plaintiff, with all the circumstances shown, it must be held that the engineer could reasonably anticipate that there was imminent peril impending not only to the two children, but also to the women he saw running after the children.

Counsel for defendants call particular attention to the ruling in Boyd v. Railway, supra. In that case the plaintiff was an adult, and, so far as the statement shows, the only person observed by the engineer running toward the track. Under the circumstances

there shown, it was held that as to Boyd the zone of danger was the track on which the train was approaching, and the engineer could assume that he knew of the approach of the train, and would stop before going upon the track. There is somewhat more of likeness to this case in the case considered in State ex rel. v. Reynolds, 289 Mo. 479, to which also special attention is called. In that case several persons were waiting at a station, for a local train. A fast train, not scheduled to stop at that station, was seen approaching from the direction of the expected local train, and they attempted to cross the track in front of the fast train. The group consisted of three women and two children. There is no reference to the ages of the two children, nor to other circumstances distinguishing them from the three adults, nor anything tending to show a connection between the children and the adult woman, who alone was struck. There is nothing appearing in the statement or opinion indicating that the act of the woman in running upon the track was, or might be, dependent upon the action of the children running ahead of her. There was no question of attempted rescue. As we view the immediate issue, the question is whether it must be said that the duty of the engineer in respect to plaintiff's wife is to be measured solely by reference to the fact that he saw her, an adult, who must have had knowledge of the approach of the train and who was running toward the track, and that there must be excluded consideration of the fact that she was running behind the two small children, who were from twenty to thirty feet ahead of her, and were also running toward the track. Undoubtedly, in passing upon the duty of the engineer, the case must be considered in view of all the circumstances shown, and it cannot be said the act of plaintiff's wife in running toward the track is to be regarded as wholly detached, and independent of the acts of the two children. Under the testimony as to the distance within which the train could have been stopped, the jury could well have inferred that if the engineer had acted at the time he saw the woman and the children when his engine was about 600 feet away, the speed of the train could have been checked sufficiently for Mrs. Carney to have crossed the track. On these grounds, we hold that the case was submissible under the humanitarian doctrine. We think this sufficiently appears from the testimony of the engineer that he could have stopped the train within 1000 feet, and the testimony of the fireman who said that a stop of 900 feet would have been a good stop. There is also testimony of a witness who said the train could have been stopped within 350 feet. But, there is a reasonable inference to be drawn from the testimony of the engineer and fireman, that prompt action at the time the children were seen by the engineer

would have checked the speed of the train sufficiently to allow Mrs. Carney to have gone the few additional steps necessary to clear the track. As to the children the danger zone was not merely the track. [Livingston v. Railway, 170 Mo. 452; Holmes v. Railway, 207 Mo. 149; Riley v. Mo. Pac. Railway, 68 Mo. App. 652.] We further hold that when he saw the woman was running after the children as if in an effort to overtake them, he was under a duty to consider her in connection with them.

However, counsel for defendants insist that even though the plaintiff was entitled to go to the jury under the humanitarian doctrine, plaintiff's Instruction 3 was erroneous. The instruction proceeded upon the theory that the defendants ran the train in excess of the ordinance speed of fifteen miles an hour, and thereby violated the ordinance; and, that in determining the distance at which the peril could have been discovered, and the train could have been stopped or its speed checked, the jury should not consider the actual speed of the train at the time defendants were under duty to act, but should "treat the speed thereof as being not more than fifteen miles per hour, the maximum rate fixed by the ordinance." It told the jury that if defendants could have stopped or checked the train if going fifteen miles per hour, so as to avoid striking Mrs. Carney, defendants were liable.

A great many cases have been cited by both parties. The question raised, is whether the antecedent negligence of a defendant is to be taken into consideration in determining whether he was negligent under the humanitarian rule. The precise question was recently considered in this Division in State ex rel. Fleming v. Bland, 322 Mo. 565, 15 S. W. (2d) 798, and the cases were reviewed. From what had been said or expressly held in the prior decisions of this court, the rule was deduced that in determining whether a case is within the humanitarian doctrine the facts to be considered are those which actually exist at the time the defendant saw or should have seen the peril of the other party and in the exercise of ordinary care, could have prevented the injury. Instruction 3 in submitting the humanitarian doctrine made requirement of knowledge and action on the part of defendants, not upon the hypothesis of the actual speed, but upon the hypothesis that the train was running at a speed not in excess of fifteen miles an hour. Decisions of the Kansas City Court of Appeals upon this point (Smith v. Railway, 282 S. W. 62; Ruenzi v. Payne, 208 Mo. App. 113; Goben v. Railroad, 206 Mo. App. 5; Williams v. Railroad, 149 Mo. App. 489; Murrell v. Railroad, 105 Mo. App. 88) cited and relied upon by counsel for plaintiff, were expressly overruled. The question was discussed in Alexander v. St. Louis-S. F. Railroad, 4 S. W. (2d) 888,

by the Springfield Court of Appeals. The cases were reviewed, and the ruling is in accord with the ruling of this court. The ruling in State ex rel. Fleming v. Bland, is so recent, and so explicit in its conclusions upon the identical question, that no attempt will be made here to add anything to what was said in that case. Under that ruling the giving of plaintiff's Instruction 3 was error.

Connected with the alleged error in giving Instruction 3 is the farther contention of defendants that it was error to give that instruction without also giving defendants' requested instructions 7 and 9. Their contention is that no such instruction as plaintiff's Instruction 3 should have been given at all, but that if it be conceded an instruction under the humanitarian doctrine was permissible, it should not have been given without also giving defendants' instructions numbered 7 and 9. In connection with the alleged error in refusing defendants' instructions 7 and 9, counsel on both sides discuss the question whether the negligence, if any, of Mrs. Carney barred the father from recovery for the death of his child.

Defendants offered a demurrer to the evidence under the first count, and also offered a demurrer to the evidence under the second count. In their original brief and under their points and authorities concerning the overruling of the demurrers, they did not raise specifically the question whether the negligence, if any, of Mrs. Carney under the charge of straight negligence of defendants, was a bar to recovery by the father of the child; but confined themselves to the discussion of the claim generally that plaintiff was not entitled to go to the jury under either of the theories in each count.

Counsel for plaintiff raised the question and discussed their claim that under the evidence, plaintiff, the father, was not barred of recovery for the death of the child, under either theory, and discussed the question of the father's responsibility for the negligence of the mother in respect to the death of the child, and counsel for defendants in their reply brief go somewhat extensively into that question. We recur to the defendants' offered instructions 7 and 9. They are identical in phraseology, except that Instruction 9 refers to the first count of the petition asking recovery on account of the death of the plaintiff's wife, while Instruction 7 refers to the second count asking recovery on account of the death of the plaintiff's child. Defendants' Instruction 7 told the jury that if they found Rose Carney attempted to cross in front of the approaching train with full knowledge thereof, plaintiff could not recover on the second count of his petition (that is, for the death of the child whether through negligence or violation of the humanitarian doctrine) unless they also found she made the attempt to cross in an effort to rescue the two children from impending danger; and

further told the jury that the burden of proof was upon plaintiff throughout the entire trial to prove by a preponderance of the evidence that Rose Carney was in fact attempting to rescue her children at the time she was killed, and that unless plaintiff sustained such burden by credible facts and circumstances, plaintiff could not recover on said second count.

Instruction 9 laid the same conditions upon plaintiff's right to recover on the first count, which was for the death of his wife.

Instruction 7 applies the same rule as to right of recovery for the death of the child, which is applied by Instruction 9 to the question of right of recovery for the death of plaintiff's wife. A distinction to be made in the attempted application of this rule lies in the fact that Mrs. Carney, being an adult, could be guilty of negligence contributing to her death and constituting a bar to recovery by plaintiff for her death under the charge of straight negligence of defendant, and her negligence would be a bar, unless she were absolved because of the fact that she went on the track in an attempt to rescue the two children put in peril by the negligence of defendant. But, the infant could not be guilty of negligence, and we think negligence is not to be imputed to the father. Under the charge of straight negligence of defendants, the allegation that Mrs. Carney went on the track in an attempt to rescue the two children, is a part of the plaintiff's case. Under the evidence, we think that while Mrs. Carney went into imminent peril in the ordinary sense of the term, she could not be held to be in imminent peril within the meaning of the humanitarian rule, unless she went on the track in an attempt to rescue the two children. Unless she so went she would be within the rule in Boyd v. Railway, supra, and State ex rel. v. Reynolds, supra, and like cases. This is held under the evidence and under the ruling in the cases just mentioned, and the ruling in Clark v. Atchison, Topeka & Santa Fe Railway, 319 Mo. 865, 6 S. W. (2d) 954, 960. This would have to be so because, under the evidence, and the facts as set forth in the statement made for plaintiff, she knew of the near approach and the terrific speed of the train. She went forward either to beat the train, or to save and rescue the children. As to the right of recovery for the death of the infant child, the situation presented is different. As to recovery for the death of the child under the humanitarian doctrine, as submitted by plaintiff's Instruction 3, it was not necessary to show that Mrs. Carney went on the track in an attempt to rescue the two children. The right of recovery for the death of the child would exist, if defendants in the exercise of ordinary care could have avoided the death of the child. We think also the father was not, as a matter of law, barred from recovery for the death of the

child under the charge of straight negligence, although Mrs. Carney went on the track in an effort to beat the train with knowledge of its speed and near approach.

Under the facts in this case the jury might believe that defendants were guilty of negligence, which was a proximate cause of the death of the child; but, under what they would have been told by Instruction 7, if they believed that the mother knew of the approach and speed of the train, and went on the track but not in an attempt to rescue the two children, they could not find in favor of the father, this plaintiff. The action of the plaintiff is for a penalty in the way of punishment for an act of negligence causing the death of the child (Grier v. Railroad, 286 Mo. 523), and it is a penalty created by statute. [Sec. 4217, R. S. 1919.] There is no suggestion in the case of a joint enterprise on the part of the father and mother, nor is the question of agency raised. The question is presented merely upon the fact of the existence of the family relation. Counsel for defendants have cited cases from other jurisdictions: Darbrinsky v. Pennsylvania Co., 94 Atl. (Pa.) 269; Vinette v. Railway Co., 47 Wash. 320; Toner's Admr. v. Railroad Co., 58 S. W. 439 (Kentucky), and one or two other cases, in support of their contention that on account of the family relation, the husband was responsible for the acts of his wife, and in a case of this character is barred by her negligence, if any, contributing to the death of the child. Other authorities, and we think the weight of authority, are to the contrary. See Phillips v. Denver City Tramway Co., 53 Colo. 458; 32 Ann. Cas. 29, 33, and note there found; also to the same effect, the note in 23 A. L. R. 690. Further reference is also made to 8 R. C. L. sec. 93, p. 1244; also notes in 18 L. R. A. (N. S.) 328 and in 18 L. R. A. (N. S.) 754. In the recent case of Chawkley v. Wabash Railway, 317 Mo. 782, the suit was by the wife who survived the accident in which her husband was killed, and wherein also two of their minor children were killed. It is stated in the opinion, l. c. 801, that the husband was guilty of negligence. It was ruled that the wife was also guilty of negligence contributing to the death of the two children. It was held that she could not recover, on the primary negligence of defendant, the penalty for the death of the children, because of her own negligence contributing thereto. But, that holding was not expressed to be upon the ground of negligence on the part of the husband, but was put upon the ground that the plaintiff, the parent seeking recovery, was herself guilty of negligence. In respect to the demurrer to the evidence under count 2, we overrule the contention of defendants that the plaintiff as a matter of law was barred of recovery for the death of the child, and on the same ground and for the reasons above stated hold that

defendants' Instruction 7. was properly refused. On the grounds heretofore stated we hold that it was error to refuse defendants' Instruction 9, which referred to the right of plaintiff to recover under the first count for the death of his wife.

Complaint is also made of the refusal of defendants' offered Instruction 5. This referred to the right of recovery under the second count of the petition, that is, recovery for the death of the child. It was in some respects cautionary, and otherwise an amplification of defendants' Instruction 7, and for the reasons stated its refusal was not error. Defendants' Instruction 6 was the same as said Instruction 5, but applied to the first count of the petition for the death of plaintiff's wife. The refusal of that instruction was not reversible error, for the reason that the subject of it was sufficiently covered by Instruction 9.

Under the conclusions we have reached and announced, the judgment is reversed as to both counts and the cause remanded. *Seddon* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court. All of the judges concur.