Mary E. Clark v. Atchison, Topeka & Santa Fe Railway Company and St. Joseph Terminal Railroad Company, Appellants. —6 S. W. (2d) 954.

Division One, April 11, 1928.

*Cyrus Crane* and *Culver, Phillip & Voorhees* for appellant, Atchison, Topeka & Santa Fe Railway Company; *Brown, Douglas & Brown* of counsel.

*Ryan & Zwick, M. P. Murphy, Gerald Cross* and *Pross T. Cross* for respondent.

RAGLAND, J.—This is an action ⬛⬛⬛ surviving wife to recover the penalty prescribed by Section 421 Revised Statutes 1919, for the death of her husband, which occurred September 13, 1920, and which she alleges was caused by the negligence of defendants.

On the date mentioned defendant St. Joseph Terminal Railroad Company, a Missouri corporation (hereinafter called the Terminal Company), owned and operated terminal railroad tracks in the city of St. Joseph over which the trains of certain trunk lines entering the city reached the Union Depot. Defendant, The Atchison, Topeka & Santa Fe Railway Company, a Kansas corporation (hereinafter called the Railway Company), was operating a line of railroad from St. Joseph, Missouri, to Topeka, Kansas. Through a running arrangement with the Terminal Company its trains after leaving the Union Depot in St. Joseph and in the course of their passage through the city ran over one of the Terminal Company's tracks which crossed Hickory Street. As this crossing was the place where plaintiff's husband lost his life a general description of it will be in order.

At the place in question Hickory Street, which was approximately sixty feet wide, was crossed by quite a number of railroad tracks. We are concerned with only two of them: one used by in-bound trains of the Burlington Railroad Company, and the other, owned by the Terminal Company, for out-going trains of the defendant Railway Company. Hickory Street ran east and west; the railroad tracks, where they crossed the street, extended north and south. The Terminal track just referred to was the track next west of the Burlington track. The distance between the east rail of the Terminal track and the west rail of the Burlington track was ten feet and eight inches. The Burlington track after leaving Hickory Street going south curved sharply to the east. There was a pedestrian walk along the south side of the street where it was crossed by these railroad tracks. A watchman's shanty was located on the east side of the switch yard immediately south of the south side of the street. •It was the duty of the watchman stationed there to raise and lower the gates which were provided as barriers to stop the flow of traffic along the street, both vehicular and pedestrian, when the crossing was in use by the railroads. It frequently happened that such use would at a given time be so prolonged that pedestrians would become impatient and go around or crawl under the gates and continue their way along the street and across the tracks.

About 7:30 o'clock in the evening of September 13, 1920, Dr. Clark, the deceased, while standing on or crossing the Terminal track near the south side of Hickory Street, was run over and killed by an out-bound passenger train of the defendant Railway Company. Just preceding that occurrence two passenger trains were approaching the crossing: a Burlington train from the south and another, the one that

ran over Clark, from the north. Both were comparatively short trains, each having only three or four coaches, and both were running at moderate rates of speed. The Burlington train reached the crossing first; about the time its rear coach cleared the crossing going north, the engine of the train moving south, the one that struck Dr. Clark, had reached a point thirty or thirty-five feet north of the north side of the crossing. The witnesses are not in entire accord as to the positions of the two trains with reference to the crossing at the time they passed each other. But the foregoing statement is sufficiently accurate for an understanding of the questions involved. Both gates, the one on the east side and the one on the west side across Hickory Street, had been down for several minutes before either train reached the crossing.

Four witnesses claim to have seen Dr. Clark at or immediately preceding the time he was struck; two of them testified for plaintiff, and two for the defendants. Plaintiff's two witnesses when they first saw Clark were walking east along the south side of Hickory Street, approaching the west crossing gate which had been lowered. It was comparatively dark, but the crossing was fairly well lighted by an electric light on either side. Clark was standing on the Terminal Company's track, with his back somewhat to the north, looking toward the southeast, from which direction a Burlington train was approaching. His position and attitude were made somewhat conspicuous to these observers upon their first view of him, by the beams of the electric headlight of the approaching train which were falling upon him. Presently they saw a train coming from the north on the track on which he was standing and they continued watching him with some anxiety. But he never moved, turned his head, nor changed his position in any respect. While he was so standing, the Santa Fe train, without slacking speed or giving warning of any kind, ran over him.

One of defendants' witnesses was a Rock Island engineer. He was sitting in the cab of his engine, which was standing on the east side of the Burlington track just north of the street crossing. This witness testified in part as follows:

"Q. Did you see Dr. Clark that evening—the man that was killed whom you afterwards learned was Dr. Clark? A. Yes, sir.

"Q. Did you see the direction he came from? A. No, sir.

"Q. Where was he the first time you noticed him? A. Standing at the switch shanty talking to a man by the name of Hart—shaking hands.

"Q. When was the next time you noticed him? A. Just before the train hit him as he approached. I noticed him walking toward the train.

"Q. You noticed him as he walke ward the train? A. Yes, sir.

"Q. Could you see him then? Did the Burlington train pass from between you and him when you saw him? A. Yes, sir.

"Q. Now, what direction was he looking, and how did he move, and what did he do, and what occurred? A. Well, he was looking kind of north up the track. It looked like he was watching the Burlington train going up the track through the yards and apparently was watching this Santa Fe train coming, and about the time the Santa Fe train got right at the crossing, I should say in the middle of the crossing, it seemed as though he kind of picked up his speed in order to go across and go west. . . .

"Q. What do you mean by 'picked up his speed?' A. Well, he was standing, I should say, about twelve to fifteen feet from the Santa Fe tracks, and when he seen this Santa Fe train coming, the way I figured, he was trying to get across ahead of it.

"Q. Well, now, you say he was looking—A. (interrupting) Looking toward the Santa Fe train at that time. . . .

"Q. Did you see the train as it hit him just the moment it hit him? A. Yes, sir.

"Q. What did it do to him? What occurred? A. Well, he was walking across, and it hit him on the right side—the pilot—that is, the pilot beam, and knocked him toward the coupler in the middle of the engine on the pilot, and rolled him down that way, and then he passed out of my sight when he went down that way. . . ."

The witness further stated that, after Clark shook hands and left Hart, he stopped at the Burlington track long enough to let the Burlington pass him and then he went on west. At that time the Santa Fe was within fifty or sixty feet of the crossing and going six or eight miles an hour.

The other witness who testified for defendants was the fireman on the train which killed Clark. He was sitting in the cab of the engine on the left (east) side looking out of the side window as the engine approached the crossing. He testified in part as follows:

". . . as we neared Hickory Street, say, within about an engine length from the north side of Hickory Street sidewalk, I noticed off to my right—to my left rather—in the beam of the diffused—from the front of the headlight, as she goes like this (indicating), an object that I took at the time to be a person standing there looking—standing there looking in a direction to my back, and slanting toward me. . . . We were going all the time, you understand, until he attracted my attention by looking so permanently toward me, and off to my left, and I hollowed to the engineer at that time. I said, 'Give her the whistle.'

". . . He was standing, as near as I can remember, close to the center of that track (the next track east).

". . . I was afraid that by us coming up that way he might get confused, and start across, and so in order to resound the whistle signal, I hollowed to the engineer to give her the whistle, which he did. And at the same time we was still moving in that direction, why, he made a move sideways up in the direction in which we were coming, all the time glancing up in the direction in which we were coming.

"Q. Toward your engine? A. Right on him. Just looked up there.

"Q. Looked at what? A. Well, looked evidently at the headlight, or the engine, or me. Now, I don't know whether he could see me, or whether the headlight, or the engine attracted his attention or whether it was a whistle that startled him.

"Q. What did he do? A. And he made that turn to his left, like he was looking in this direction, he made the turn to the left, and apparently started in a westerly direction across in front of the approaching engine that I was on.

"Q. Yes? A. And just the minute I seen him turn around, and look like that he was going to make a move to get out of the tracks where he was at, I hollowed to the engineer. I said, 'Put it under.' [Put on the emergency brakes.] . . .

"Q. You say the moment you did notice he started to make a move toward the track, you did what? A. When he was looking in the direction back to my left, and he glanced up toward the direction in which we were coming, I thought then was the time to call his attention that he had better stay where he was, and not to make an attempt to move."

Owing to a slight curve in the tracks and the obstruction of the boiler, Clark was not in the line of vision of the engineer as the latter approached the crossing.

We have not set out in detail the evidence touching the condition of the light, the distance at which Clark could have been seen by the fireman as the engine approached the crossing, or the distance within which the engine could have been stopped after Clark could have been seen; we think it sufficient to say that after a careful examination of all the evidence we are clearly of the opinion that plaintiff made a case for the jury on the issue of negligence under the "humanitarian rule." And that was the sole issue as to negligence on which she went to the jury. Other facts will be noted in connection with the questions considered.

There was a verdict and judgment for plaintiff for $5000. Our jurisdiction of the appeal grows out of a constitutional question to be noticed later.

874

Appellants make numerous assignments of error. Without enumerating them, we will consider them in the order in which they are made—all of them, if necessary to a proper disposal of the appeal.

I. Following the institution of the suit the Railway Company in due time filed its petition for removal to the United States district court, on the ground of diverse citizenship. It alleged that there was no joint liability on the part of defendants for the acts of negligence charged in plaintiff's petition, and that the Terminal Company was joined as a defendant for the sole and fraudulent purpose of preventing a removal of the cause. The application for removal was overruled by the circuit court and that ruling is assigned as error.

It is contended that the Terminal Company is not liable for the acts of negligence committed by the Railway Company while operating its trains over the former's tracks under a license or running agreement. The contention is supported by this course of reasoning: The State chartered the Terminal Company for the sole purpose of owning and operating terminal tracks and facilities in the city of St. Joseph to be used by trunk lines of railroad entering said city in operating and running their engines and trains of cars in said city to and from the Union Depot therein; that through and by such charter the State consented to the Terminal Company's licensing or permitting other railway companies to operate their trains over its tracks; and that such consent was not qualified by the provisions of Sections 9879 and 9880, imposing upon lessor and licensor railroad companies liability for the negligent acts of their lessees or licensees, because a terminal company does not fall within the category of railroads to which such provisions are applicable. The reasoning, with due deference to learned counsel, seems superficial. It conclusively appears from the record, including the petition for removal, that the Terminal Company was incorporated as a *railroad company* and not as a *union depot company*. And it is not alleged that it operated a union station or depot under the provisions of what is now Section 10003, Revised Statutes 1919. Now there is no special statute providing for the incorporation of terminal railroad companies, nor is there one investing them with powers, privileges and immunities not conferred upon other railroad companies. Terminal companies, such as appellant, are created under the statute relating to railroad companies generally. [Art. 11, Chap. 90, R. S. 1919.] That statute, including said Sections 9879 and 9880, is the primary source of their corporate power, and the limitations upon that power which it prescribes are binding upon them regardless of anything that may appear in their charters. Charters can confer no greater

power than the statute which gives them life. And the only permission given by the *statute* for an owning railroad company, not operating a union station or depot, to license other railroad companies to use its tracks is expressly conditioned upon the continued and unbroken liability of the owner for the negligent acts committed in the operation of its road. If appellant Terminal Company is not in the category of railroad companies to which such permission is given, then it entered into a running agreement with the appellant Railway Company without the State's consent and is liable for the negligence of the latter while running trains over its (the Terminal's) tracks.

But the Terminal Company is unquestionably "a railroad company" or "railway corporation" within the purview of the statutory provisions just referred to. Appellants in construing Section 9880 point out that the first provision thereof is in express terms made applicable to "any railroad, street railway, terminal or other railway corporation;" whereas, the provision next following is limited to "any such railroad, street railway, or other railway company or corporation." The omission of the word "terminal" in the second provision, they say, shows that it was the intention of the Legislature to exclude terminal companies from the class of railroad companies which "shall remain liable for all acts, debts, claims, demands, judgments and liabilities of the lessee or licensee." The construction is a strained one. The language of the second provision enumerating the railway companies or corporations to which it is applicable is broad and all-inclusive. If it had been the intention of the Legislature to except terminal companies from its operation, it would have been easy to have said so in express language instead of leaving it to vague implication. The Legislature must have been fully cognizant of Section 9879, in which we find: "And a corporation in this State leasing its road to a corporation of another State, or licensing or permitting a corporation of another State, under any running agreement, to run engines and cars upon its road in this State, shall remain liable as if it operated the road itself." And certainly if there had been an intention to amend or modify it in respect to the provision quoted, by withdrawing from its operations terminal companies, such intention would have been clearly expressed and not left to conjecture. In view of the long-established policy of the State of not permitting railroad companies to avoid their charter duties and responsibilities by leasing their roads or permitting other companies to run trains over them, a legislative intent to relieve to any extent terminal companies from such duties and responsibilities must be made clearly manifest before the courts will be warranted in giving the alleged intent effect.

876

The overruling of the application for removal was not error. [Lanning v. Railroad, 196 Mo. 647, 94 S. W. 491; Stotler v. Railroad, 200 Mo. 107, 98 S. W. 509; Johnson v. Railways, 203 Mo. 381, 101 S. W. 641.]

II. The action of the Circuit Court of Buchanan County in ordering the venue of the cause changed to Holt County is the basis of appellants' second assignment of error. The record facts with respect thereto are stated by them as follows:

"This case was assigned to Division No. 2 of the Buchanan Circuit Court. The plaintiff filed her motion for a change of venue, in that division, alleging that the judges of Divisions No. 1, No. 2, and No. 3 of said circuit court were prejudiced against her and that the defendants had an undue influence over the minds of the judges of all of said divisions. Defendants asked for a hearing on the question of fact, whether either of the judges of Division No. 1 or No. 3 was biased against the plaintiff or whether either of the defendants had any undue influence over the minds of either of said judges, and offered to show that neither of said judges was prejudiced against the plaintiff and that neither of the defendants had any undue influence over either of said judges, and that plaintiff could have a fair and impartial trial before either of them. The court declined to hear any evidence in the matter, the court holding that 'under the statute, the affidavit filed by the plaintiff is conclusive upon the court.' Thereupon defendants requested that, if a change of venue was granted, the court send the case to Division No. 3 of said court. The court declined to do so on the ground that the affidavit disqualifying the judge of that court was conclusive. Thereupon the court granted a change of venue and ordered the case sent to the Circuit Court of Holt County, Missouri. Defendants' exceptions taken to all of said rulings were preserved in a term bill of exceptions and the rulings of the court were made grounds for a new trial."

Change of venue in civil cases is regulated entirely by statute. Under Section 1361, Revised Statutes 1919, as amended in 1921 (Laws 1921, p. 204), the court is required to award a change of venue to some other county, if it finds the *application* sufficient, except: (1) when the application is founded on the interest, prejudice or other objections to the judge, *or judges*, and the parties agree upon a special judge or request the election of a special judge; and (2) when the removal is sought on the ground of objections to or prejudice of the inhabitants of the county and such ground is controverted by a counter-affidavit filed by the adverse party. The application in the instant case did not fall within either exception; and there is no contention that it was not *sufficient* in both form and

substance. The action of the court in awarding a change of venue to some other county was, therefore, in conformity with the plain mandate of the statute.

The contention of appellants that the affidavit filed in connection with the application for a change of venue was conclusive only as to the judge of Division No. 2 of the Buchanan Circuit Court, to whom it was presented, and that evidence should have been heard touching the alleged disqualifications of the judges of the other two divisions, is based upon Eudaley v. Railroad, 186 Mo. 399, 85 S. W. 366, and Guy v. Railroad, 197 Mo. 174, 93 S. W. 940, decided by this court, and State ex rel. v. Dabbs, 118 Mo. App. 663, 95 S. W. 275, decided by the Kansas City Court of Appeals. The first two dealt with changes of venue from Jackson County and the third from Jasper County—the circuit court of each of which consisted of two or more divisions. The holding in each of these cases, that an affidavit for a change of venue on the ground of the disqualification of all the judges of a circuit court was conclusive as to the judge of the division in which the cause was pending, was based fundamentally on the proposition that the question was ruled by the general law relating to changes of venue applicable in every county in the State, except as modified by the respective original acts creating additional divisions of the circuit court in Jackson County and Jasper County, and that, as the statute generally applicable contemplated a court having but one judge against whom an affidavit for change of venue should be conclusive, the effect of such affidavit should by analogy be limited to the judge of the division in which the cause was pending, where the court consisted of a number of divisions. By the amendment of 1921 the words "or judges" were added to Section 1361, as we have indicated. This amendment makes the essential ground of decision in the cases just referred to no longer tenable. The "judges" of circuit courts having more than one judge, considered collectively, take the place of the "judge" contemplated by the change of venue statute at the time of its original enactment. However, the general statute, notwithstanding the amendment, is not applicable to the specific class of circuits which has its own peculiar change of venue law. [State ex rel. v. Pence, 240 S. W. 443, 444.]

III. The next assignment of error and the grounds suggested in support of it are stated by appellants as follows:

"The petition does not state a cause of action and the court erred in overruling defendant's objections to the introduction of any evidence, because Section 4217, Revised Statutes Mo. 1919, is violative of Section 28, Article IV, of the Constitution of Missouri. [No bill shall contain more than one subject, which shall be clearly expressed in its title.]

878

"This action is based on Sec. 4217, R. S'. Mo. 1919. In 1905, the Legislature amended Sec. 2864, R. S'. Mo. 1899. The title to the amendatory act is 'An Act to Amend Sec. 2864 of Chapter 17 of the Revised Statutes of the State of Missouri, 1899, entitled "Damages and Contributions in Actions of Tort." ' [Laws Missouri, 1905, page 135.] By the amendment, the act was made to apply to fellow-servants, the operator as well as the owners of street cars, electric or terminal cars or trains, automobiles and motor cars; and made them, as well as those embraced within the original act, liable for a *penalty* of not less than $2000 nor more than $10,000 for a wrongful death. The title to the original act, 'Damages and Contributions in Actions of Tort,' does not indicate in any way that the subject-matter of the act relates to the imposition of a penalty."

Section 2864, Revised Statutes 1899 (now Sec. 4217, R. S. 1919), first appeared in the statutes of this State as a part of an act entitled: "Damages.—An Act for the better security of life, property and character," passed in 1855. That identical act was carried forward in the General Statutes of 1865, under the title, "Damages and Contributions in Actions of Tort," and was so carried forward in subsequent compilations and revisions, some additional sections being added from time to time, but otherwise substantially the same in form and substance, down to and including the Revision of 1899. The original act was not unconstitutional for the simple reason that the Constitution of this State at the time of its passage contained no provision similar to Section 28, Article IV, of the present Constitution. The amendment of 1905 did not introduce into said Section 2864 any alien or unrelated matter. [Grier v. Railway Co., 286 Mo. 523, 288 S. W. 454.] And the rule has been long established in this State that, a mere reference to the section to be amended without other description of the subject-matter of the amendatory law, is a sufficient title to an act which deals exclusively with the subject of the act amended. [Asel v. City of Jefferson, 287 Mo. 195, 205, 299 S. W. 1046.]

The section, at the time of its amendment in 1905, had been on the statute books of this State for fifty years, and it was often referred to as the *"penal* section of the 'Damage Act,' " as incongruous as that may sound to the learned. That either the Legislature or the general public was misled by the title of the amendatory act is scarcely within the range of possibility.

IV. Appellants assign as error the giving of plaintiff's Instruction 2; and the refusal of defendants' Instruction A is made the basis of another assignment. The two will be considered together.

Instruction 2 required the jury to find, among other things, "that while so upon or while so approaching and going upon said railroad tracks at that time and place the said J. M. Clark was in a position

of imminent danger and peril because of the approach of the engine and train, etc." It did not require a finding that Clark was oblivious to the approach of the train. Instruction A, asked by defendants and refused by the court, was in part as follows:

"You are instructed that the persons in charge of said engine had the right to assume and believe, if they saw said Clark approaching the track on which the engine was moving, that he would stop before he reached a place where he would be in danger of being struck; or if they saw said Clark on said track in front of said engine, they had the right to assume and believe that he would step off the track and into a place of safety; and the servants in charge of said engine were not obliged to warn said Clark, nor to stop or slacken the speed of the engine unless and until either the engineer or fireman saw, or by the exercise of ordinary care on his part would have seen that said Clark was not conscious of the approach of said train and was in danger of being struck by it, and that he did not intend to get out of its way."

In view of the evidence, we see nothing wrong with Instruction 2. That Clark was in a position of imminent peril, was a constitutive element of the cause of action, one of the ultimate facts which it was necessary for plaintiff to plead and prove (Banks v. Morris & Co., 257 S. W. 482), and which of course it was necessary for the jury to find in order to warrant a verdict in her favor. There was ample evidence to justify such a finding. Plaintiff's evidence tended to show that Clark was standing upon the track on which the train was approaching, with his back to the train, looking in an opposite direction, with his attention seemingly riveted on another moving train, and apparently unconscious of the one coming on the track upon which he was standing. If this was true, he was unquestionably in a position of imminent peril. The instruction also required a finding that the engineer and fireman knew, or by the exercise of ordinary care would have known, of Clark's peril.

Now with respect to Instruction A. If Clark saw the train coming, or knew that it was coming, he was not in a position of imminent peril. Although a person may be in the pathway of approaching danger, yet, if he is fully cognizant of it and has the present ability to easily avoid it, he is not in a position of imminent peril within the rule. The presumption is that under such circumstances he *will avoid* the danger. Consequently, if the engineer of a train sees an adult person approaching the track, unless there is something in his actions or manner to indicate the contrary, the engineer has the right to assume that such person will stop before going on the track; or if on the track, that he will step off into a place of safety. This in substance has been ruled so often that we deem it unnecessary to cite cases. In this case the fireman testified that

when he first saw Clark the latter was standing near the track, not in the zone of danger, looking directly at the approaching engine and train. If that was true, the fireman, until he saw some indication to the contrary, had the right to assume that Clark would remain in a place of safety until the train had passed. The refusal of defendants' Instruction A, which has been set out in part, was manifest error.

Other alleged errors complained of will probably not recur on another trial. Because of the refusal of defendants' Instruction A the judgment is reversed and the cause remanded. All concur.