In Matter of W. W. Graves, Jr., Petitioner.—30 S. W. (2d) 149.

Court en Banc, July 8, 1930.

*Stratton Shartel*, Attorney-General, and *A. M. Meyer*, Assistant Attorney-General, *Amici Curiae*, for petitioner; *L. Cunningham* of counsel.

*Charles M. Howell, James R. Page, Casey & Wright, James P. Aylward, De Armond & Maxey* and *C. P. Le Mire* for respondent.

ATWOOD, J.—This is an original proceeding under the Habeas Corpus Act, submitted upon petition, amended return, demurrer thereto, agreed statement of facts, briefs filed and oral arguments made, the Attorney-General of Missouri appearing as *amicus curiae*.

From the agreed facts it appears that petitioner, W. W. Graves, Jr., is and was on the 6th day of November, 1928, a member of the Board of Election Commissioners of Kansas City, Jackson County, Missouri; that on said date "an election was held in said city, county and state where candidates for electors for President and Vice-President of the United States were to be voted for, as well as candidates

for state, county and local offices;" that as a member of said Board of Election Commissioners it was the duty of petitioner "to have printed and furnish to the judges of election in said city ballots in the form and manner provided by law for the use and benefit of persons entitled to vote;" that said petitioner "as a member of said Board of Election Commissioners, did not cause to be printed and furnish to the judges of election for the use of persons entitled to vote in Kansas City, Jackson County, Missouri, separate ballots containing the names of candidates for electors for President and Vice-President of the United States of a color plainly distinguishable from other ballots furnished voters at said election, but, on the contrary, caused to be printed and furnished to said judges for the use of said voters ballots on each of which were placed the names of all candidates for public office to be voted for in said city, including names of candidates for electors for President and Vice-President of the United States and candidates for state, county and local offices, and under the party designation of each party were placed the names of the candidates for President and Vice-President of the United States."

It further appears from the pleadings that petitioner was arrested, taken into custody and detained by the constable of Kaw Township, Jackson County, Missouri, by virtue of a warrant for his arrest issued by a justice of the peace in and for said township and based upon complaint made before said justice of the peace charging petitioner with the commission of a misdemeanor in said city, township, county and state on the 6th day of November, 1928, in that he did then and there, while acting as a member of said Board of Election Commissioners, "unlawfully, wilfully and intentionally neglect and refuse to cause to be printed and furnished to the judges of election in the different precincts in Kansas City, Jackson County, Missouri, separate ballots for the use and benefit of those who were entitled to vote under and by virtue of the provisions of Sections 4748 and 4749, Revised Statutes of Missouri 1919, containing the names of candidates for electors for President and Vice-President of the United States and no other candidates, said ballots to be of a color plainly distinguishable from other ballots furnished the voters at said election, all in violation of Section 4750, Revised Statutes of Missouri 1919." The constable attempts to justify his detention of petitioner in a long amended return, the gist of which is that petitioner violated the provisions of Section 4750, Revised Statutes 1919, as charged, and that said section was and is a valid and subsisting law. Petitioner demurs to said return on the grounds that it shows on its face that his detention is unlawful, illegal and without authority of law; that said Section 4750 was repealed by an act of the General Assembly appearing in the Laws of Missouri, 1921, at page 308 *et seq.*, and that he stands charged with no offense known to the law; and that the information filed and

capias issued are nullities and afford no legal grounds for his arrest and detention.

At the outset we are met with divergent views as to the meaning of Section 4750, Revised Statutes 1919. The Attorney-General insists that it "never at any time applied to other than the ballots for women." Counsel for respondent say: "This position is absolutely untenable." Section 4750 is a re-enactment in the revision of 1919 of Section 2 of an act of the General Assembly approved April 5, 1919, which act thus appears on pages 335 and 336 of the Laws of Missouri, 1919: "(S. B. 1.)

"ELECTIONS: Votes for Women.

"AN ACT to amend article 2, chapter 43 of the Revised Statutes of the state of Missouri of 1909, by adding thereto a new section to be known as section 5800-a, extending the right of suffrage to women in certain cases, providing for their registration and separate ballots for their use.

| "SECTION | SECTION |
| --- | --- |
| "1. Amending article 2, chapter 43. 5800-a. Extending the right of franchise. | 2. Form of ballot and manner of voting. |

"Be it enacted by the General Assembly of the State of Missouri, as follows:

"Section 1. Amending article 2, chapter 43.—That article 2 of chapter 43 of the Revised Statutes of the state of Missouri of 1909, be, and the same is hereby amended by adding thereto a new section to be known as section 5800-a, reading as follows:

"Sec. 5800-a. Extending the right of franchise.—Any person, whether male or female, and in all respects except sex qualified to vote for members of the most numerous body of the state legislature, may vote for electors for president and vice-president of the United States.

"Sec. 2. Form of ballot and manner of voting.—The officers and persons charged with the duty of printing and furnishing ballots under the general election laws of this state shall for the use and benefit of only those who are entitled to vote under and by virtue of the provisions of this act, cause to be printed and furnished to the judges of election in the different precincts in this state at all elections where candidates for electors for president and vice-president of the United States are to be voted for a like number of ballots distributed between the political parties as now required by law, and which shall have printed thereon the names of the candidates for electors for president and vice-president of the United States and no other candidates. Said

ballots shall be of a color plainly distinguishable from the other ballots furnished the voters at said election, and shall be cast, counted and the returns thereof made in the same manner as other ballots at such election are cast, counted and returned; *provided,* that in all cities in this state wherein voters are qualified to register in order to be qualified voters at any election, the persons entitled to vote under the provisions of this act shall be required to register the same as other voters, and all the laws relative to registration of voters shall apply to the persons authorized to vote under this act.''

Looking first to the text of above Section 2, now Section 4750, Revised Statutes 1919, to ascertain its meaning, we find that it purports to be ''for the use and benefit of only those who are entitled to vote under and by virtue of the provisions of this act.'' There is nothing in the act itself indicating that these words were not used in their plain, ordinary and usual sense. In such case they should be so taken and understood. [Sec. 7058, R. S. 1919.] The plain, ordinary and usual meaning of the word ''entitle'' is: ''To give a right or title to; to qualify for, with a direct object of the person, and a remote object of the thing; to furnish with grounds for seeking or claiming with success.'' [Webster's New International Dictionary.] The question then necessarily arises: Who were given the right to vote ''under and by virtue of the provisions of this act?'' The only part of the act that indicates who may vote is above Section 5800-a, now Section 4749, Revised Statutes 1919, and its use of the clause ''and in all respects except sex qualified to vote'' is an obvious recognition of the fact that male persons as a class were already entitled to vote. If this interpretation suggests redundancy in the language of this section, it may be truthfully said that outright contradiction would follow any insistence that male persons were entitled to vote under and by virtue thereof. The relation of this section to Section 2 is limited and defined by the language above quoted from Section 2, so that the provisions of Section 2 could at most apply only to the class of persons, to-wit, female persons, who were given the right to vote under and by virtue of the preceding section. It thus clearly appears from the act itself, read as a whole, that if any persons were entitled to vote under and by virtue of its provisions they were female and not male persons.

Assuming, without conceding it as a fact, that the language of the act is ambiguous, the same conclusion is reached by resort, in such cases permitted (State ex rel. Boonville v. Hackmann, 293 Mo. 313, 319, 240 S. W. 135; 25 R. C. L. 1012-1017, 1052, 1053), to a study of preexisting conditions and a consideration of the mischief sought to be remedied thereby. It is well known that long prior to the passage of this act male persons had the right to vote in circumstances including those above

mentioned under and by virtue of Section 2, Article VIII, Constitution of Missouri, the whole subject of the regulation, including the prescribing of qualifications of suffrage, having been left by the national Constitution to the several States, except as it is provided by that instrument that the election of Representatives in Congress shall have the qualifications requisite for electors of the most numerous branch of the State Legislature, and except as provided by the Fifteenth and Nineteenth amendments. [Cooley's Constitutional Limitations (8 Ed.) 1360, 1362.] Female persons had no such right. The General Assembly is presumed to have known this preexisting state of the law, and from its use of the words above quoted from Section 2 must have had it in mind. It follows, therefore, that if any persons were entitled to vote under and by virtue of the provisions of this act they were female persons who up to that time had no such right.

We are confirmed in this conclusion by the application of another rule of statutory construction. When the language of a statute is ambiguous recourse may be had to the title in order to ascertain the true meaning of the act. [25 R. C. L. 1031, sec. 267; Straughan v. Meyers, 268 Mo. 580, 588, 187 S. W. 1159; Strottman v. Railroad, 211 Mo. 227, 252, 109 S. W. 769; State ex rel. v. Fort, 210 Mo. 512, 527, 109 S. W. 737.] Apparently recognizing the clear applicability of this rule counsel for respondent quote under paragraph III of their points and authorities only a portion of the title of this act, omitting the most significant part embraced in the last two lines and closing with a period after "5800-a" where in the title itself only a comma appears. The title in full is as follows:

"AN ACT to amend article 2, chapter 43 of the Revised Statutes of the state of Missouri of 1909, by adding thereto a new section to be known as section 5800-a, extending the right of suffrage to women in certain cases, providing for their registration and separate ballots for their use."

This title shows beyond peradventure that the legislative intent was merely to extend a limited right of suffrage to women with provision for their registration and use of separate ballots. Mayes v. United States Garment Workers, 6 S. W. (2d) 333, 336, 320 Mo. 10; Clark v. Ry. Co., 6 S. W. (2d) 954, 960, 319 Mo. 865; and State ex rel. Garvey v. Buckner, 272 S. W. 940, 942, 308 Mo. 390, cited by respondent, all relate to the constitutional sufficiency of titles, having no bearing whatever on their availability as aids in statutory construction, and are without application to the point here discussed.

The soundness of this interpretation of the act is demonstrated by a further study of history more or less contemporaneous, to which

resort may properly be had in such cases. At the time the act was passed it was a matter of common knowledge that a proposed amendment of the Constitution of the United States extending the right of suffrage to women was in process of ratification by the states. On July 3, 1919, at an extra session of the same General Assembly, a concurrent resolution was approved ratifying the proposed constitutional amendment. Of course, the members of the General Assembly did not know, at the time the act in question was passed, when the number of states requisite to secure the adoption of the proposed amendment to the national Constitution would ratify it, but it is evident that in any event they wanted women to have the limited right of suffrage of voting for candidates for electors for President of the United States. We cannot assume that it was their intention to entitle women under and by virtue of this act to only a limited right of suffrage in case a constitutional amendment either state or national became effective entitling women to full right of suffrage, because to do so would be to ascribe to them an intention to pass an unconstitutional act. It must have been their intention by the passage of this act to entitle women to this limited right of suffrage until such time as they would be entitled to full right of suffrage by adoption of such a state or national constitutional amendment, upon the happening of which event the intent and purpose of the act would be fully served. As a matter of fact subsequent events turned out that way. The Nineteenth Amendment to the national Constitution was ratified by the requisite number of states and became effective August 26, 1920, the first paragraph being as follows:

"The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex."

Its adoption struck from the constitutions and statutes of the several states the word "male" wherever it occurred as a limitation upon the right of the citizen to vote. [Cooley's Constitutional Limitations, 8 Ed., p. 1362.] From that date female persons were entitled to vote the same as male persons, without the aid of state legislation, although the Constitution of Missouri was in this respect brought in harmony with the national Constitution by adoption on November 7, 1922, of an amendment extending generally the right of suffrage to women. In the light of this history it seems clear that the act of the General Assembly approved April 5, 1919, was passed for a definite and limited purpose that was completely served by the early adoption of the Nineteenth Amendment to the national Constitution, and thereafter it was without function or meaning. It matters little whether it be said, as in State ex rel. Kreiter v. Straat, 41 Mo. 58, 60, that the paramount law of the land superseded and annulled the act because the limited right of suffrage thereby given was incon-

sistent with the amendment, or that the provision of the act entitling women to limited suffrage was rendered inoperative by the constitutional amendment that entitled them to full suffrage, following Neal v. Delaware, 103 U. S. 370, 389. In either case from and after the adoption of the Nineteenth Amendment female persons were entitled to every right of suffrage under and by virtue of this amendment, and were entitled to no right of suffrage under and by virtue of the act here in question. It follows that the requirement of the act that they be furnished with separate ballots having printed thereon only the names of candidates for electors for President and Vice-President of the United States was thereafter inoperative.

It is not surprising, therefore, that an act so obviously superseded by the paramount law of the land was not thereafter expressly repealed by legislature enactment. Counsel for petitioner vigorously assert, and counsel for respondent as vigorously deny, that it was repealed by implication by an act of the General Assembly approved March 11, 1921, found in the Laws of Missouri, 1921, at page 308 et seq., expressly repealing Sections 4859, 4861, 4868 and 4869 of Article 6, Chapter 30, Revised Statutes 1919, entitled "Ballots, Voting and Returns," enacting four new sections in lieu thereof similarly numbered, and enacting two new sections numbered 4891a and 4891b. Construing, as we do, the Act of 1919 to mean that only female persons were to be furnished with separate ballots for expression of their choice of candidates for presidential electors, and that even this requirement was inoperative after adoption of the Nineteenth Amendment to the national Constitution, we deem the question of this act's implied repeal of no consequence in determining whether or not petitioner stands charged with any crime by reason of his failure to follow any of its provisions.

However, in the course of their insistence that Section 4750, Revised Statutes 1919, was not impliedly repealed by the passage of this act of 1921, counsel for respondent argue that the separate ballot for presidential electors here contended for by respondent is authorized by the provisions of the act itself. We have carefully considered the act in the light of this claim and find that its plain terms are just to the contrary, as indicated by the following excerpts from some of the new statutes so enacted (italics ours):

"Sec. 4859. Every ballot printed under the provisions of this article shall contain the names of every candidate whose nomination for any office specified on the ballot has been certified or filed according to the provisions of this chapter, and no other names. *The names of all candidates to be voted for in each election district or precinct shall be printed on one ballot; all nominations of any political party or group of petitioners being placed under the party name* designated

by them in their certificates of nomination or petitions, *and the ballot shall contain no other names, except that in case of electors for president and vice-president of the United States, the names of candidates for president and vice-president may be placed immediately below the party or political designation,* upon certification in writing by the respective party state committee of nominations of such candidates to the secretary of state at any time before the secretary of state is required by law to certify the candidates of the several·political ·parties and groups of petitioners to the several clerks of the county court or to election commissioners. . . .

"Sec. 4868. . . . One of the judges shall give the voter *one, and only one, ballot,* on the back of which two judges of opposite politics shall indorse their initials with ink or indelible pencil in such manner that they may be seen when *the ballot* is properly folded, and voter's name shall be immediately checked on the register list. . . .

"Sec. 4869. On receipt of *his ballot* the voter shall forthwith, and without leaving the enclosed space, retire alone to one of the voting booths so provided, and shall prepare *his ballot* for voting in the following manner: *Should the voter desire to vote a 'straight' party ticket he shall place a cross (X) mark in the circle immediately below the party name or name of vice-presidential candidate.* If the voter desires to vote for one or more candidates on more than one party ticket, by voting what is commonly called a 'split ticket' he may place a cross (X) mark in the circle immediately below one party name and mark cross (X) marks in the squares at the left of the names of candidates on other tickets for whom he wishes to vote. If the voter desires to vote for one or more candidates whose name or names do not appear on *the printed ballot* he may do so by drawing a line through the printed name of candidate for such office, and writing below such canceled name the name of the person for whom he desires to vote, and placing a cross mark in the square at the left of such name. . . . "

In the face of such pointed reference to presidential electors we think it cannot be said that the above provisions relate only to the election of candidates for state offices. Nor is it accurate to say, as stated in the points and authorities of counsel for respondent, that "laws governing and regulating the selection of presidential electors are found in Chapter 31, Revised Statutes of Missouri 1919." As a matter of fact, Section 5289, which is a part of Chapter 31, expressly states (italics ours) that the election of electors "shall be conducted by the judges who may have been appointed to hold the general election for the same year, and *under the same regulations,*" etc. The laws relating to "ballots, voting and returns" in general elections are found in Article 6, so entitled, of Chapter 30, and in the election of presidential electors they govern in all matters relating to such subjects, not otherwise specified in Chapter 31. Chapter 31 contains no

provision as to ballots in the election of presidential electors. Consequently, we must look to Article 6,. Chapter 30, of which the above numbered statutes are a part, for the regulations applicable, and it is immaterial whether or not a presidential elector is an officer within the meaning of Chapter 30. No provision can be found in this chapter, either prior or subsequent to 1919, that requires a separate ballot to be furnished in case of presidential electors. If the language of the Act of 1921, or of the statutes thereby expressly repealed which had long been in effect, be considered ambiguous then great weight should be given to the well known "practical construction" (25 R. C. L. 1045, sec. 274) adopted by all persons charged with duties pertaining to general elections throughout the State prior to the effective date of the Act of 1921 in use of the "strip" ballot, and subsequent thereto in use of the "blanket" ballot, of placing the names of all candidates for presidential electors on the general election ballot.

In their points and authorities counsel for respondents also say that since new Section 4859, enacted as a part of the Act of 1921, expressly provides that in case of ballots for electors for President and Vice-President of the United States, the names of the candidates for President and Vice-President may be placed under the party designation, under "the doctrine of *expressio unius est exclusio alterius,* such express provision in the case of ballots for electors necessarily excludes the application thereof to ballots for candidates for state and local offices." This provision occurs in the second sentence of the excerpt above quoted from Section 4859. The language there employed does not admit of the application of this doctrine, and the cases cited in support of this suggestion are not in point. Furthermore, this section must be read in harmony with subsequent Section 4869, which states that the voter "shall prepare his ballot for voting in the following manner: Should the voter desire to vote a 'straight' party ticket he shall place a cross (X) mark in the circle immediately below the party name or name of vice-presidential candidate." The necessary conclusion from the pertinent provisions, read as a whole, is that but one form of ballot is to be used in general elections, and in case of presidential electors their names shall be placed on the same ballot with the names of candidates for President and Vice-President and the names of all other candidates to be voted for in such election.

Finally, the act approved April 5, 1919, at the time of its enactment was not a valid and binding law because its attempted grant of limited suffrage to female persons was in direct conflict with Section 2, Article VIII of the Constitution of Missouri, as it then stood, limiting the right of suffrage to qualified male citizens. While the constitutionality of the act is not challenged in this proceeding on this ground, we deem the question to be of such public interest and importance that it should be raised and ruled thus *sua sponte.* Nor was the act validated by subsequent adoption of the

national and state constitutional amendments extending full right of suffrage to all qualified citizens without regard to sex. [12 C. J. 727, sec. 99, n. 26; Realty Co. v. City of Orange, 139 Atl. (N. J.) 54; Smith v. Cameron, 262 Pac. (Ore.) 946, 947.]

Other points urged by petitioner are not discussed because their determination is not deemed essential to a decision in this case. Finding, as we do, that petitioner stands charged with no offense known to the law, it is ordered that he be discharged. All concur.