GRACE M. PRITT, Respondent, v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant, No. 41344—224 S. W. (2d) 119.

Division Two, November 14, 1949.

*Warner Fuller, George P. Mueller* and *Arnot L. Sheppard* for appellant.

898

*Paul H. Koenig, Geo. Ray Miller* and *William L. Mason, Jr.,* for respondent.

BOHLING, C.—Grace M. Pritt recovered a judgment against Terminal Railroad Association of St. Louis, a corporation, in the sum of $15,000 for the death of Alvin Pritt, her husband. Plaintiff submitted her case under the humanitarian doctrine on alleged negligence of defendant in the disjunctive in failing to stop the locomotive involved or to warn Mr. Pritt of its approach. The Terminal Railroad Association appeals, contending that plaintiff did not establish actionable humanitarian negligence; that plaintiff's evidence is perjurious, self-destructive, and without probative force; and other issues which relate to the admission and exclusion of evidence and comments by the court on portions thereof, remarks and arguments of counsel, and the giving and refusal of instructions.

Alvin Pritt died April 3, 1947, when run over by defendant's Diesel locomotive 555 on Eads bridge. It was a clear dry day. Eads bridge, connecting St. Louis, Missouri, and East St. Louis, Illinois, has two decks. The top deck is used for vehicular traffic. The lower deck is used for railroad traffic and defendant operates locomotives and trains thereover.

Two standard gauge (4 feet 8-½ inch) railroad tracks are on the lower deck, one on each side of the bridge. For some reason, not stated, the south track, track 72, is used for westbound traffic and the north track, track 71, is used for eastbound traffic. The accident happened on track 72. Tracks 71 and 72, center to center, are 28-½ feet apart. The west pier is between the two tracks with a 2 foot 10 inch connecting walkway along its east side. The pier is narrower at its west than at its east end. It is 48 feet long east and west, and at its east side is 4 feet 8 inches and at its west side is 5 feet 1-½ inches north of the north rail. Immediately west of the pier is the "M. S." (Main street) signal office, which extends westwardly 26 feet and is 5 feet 5 inches north of the north rail. The pier and the M. S. office extend 74 feet east and west. A crossover switch to track 71 begins about 15-½ feet west of the pier. The waters of the Mississippi river extended to and west along the pier. The bridge is floored along the west approach up to the east side of said pier, including the 4 feet or more between the south rail and the south bridge structure. East of said pier the track is on ties without flooring, but there is a 2 foot walkway along the south side of the bridge to the Illinois approach.

The distance between the top of the rail and the bottom of the girders supporting the top deck of the bridge is 18 feet. These girders are 21 inch I-beams, spaced 4, 5, or 6 feet apart.

Diesel locomotive 555 is 44 feet and 5 inches in length and, although its height may vary 2 or 3 inches depending upon its fuel load et cetera, its cab is 14 feet 6-¼ inches above the rail under usual operating conditions.

Repairs to the vehicular deck by the Howard Construction Company had been under way for some time, and forms made of lumber or false work were necessary for the concrete construction along, among other places, the ceiling of the railroad deck in the vicinity of the east side of said pier, which forms, after the concrete had set, were removed. Construction Company employees Foreman Fred Grant, Pritt, and Luther Owen were removing these concrete forms. Scaffolds were used and, according to the testimony favorable to plaintiff, a scaffold extended across track 72 at or just east of the east end of the west pier. They started the afternoon shift at 12:30. Owen was instructed to and ascended the scaffold to remove the lumber constituting the false work. Grant intended to investigate the progress of the work on the Illinois side of the river. He instructed Pritt that his duties were to remain there to watch out for trains and signal to the man on the scaffold so he could protect himself and not get "gassed" and to keep the track clear of boards.

With respect to defendant's charge that the testimony relied upon by plaintiff is self-destructive et cetera, plaintiff admits variations exist in the testimony but claims she made a submissible case. It is not our purpose to develop all the inconsistencies in the testimony. Plaintiff's case rests on her witnesses Grant and Owen.

We mention first, however, there was substantial testimony that one could see along the track for 800 to 1000 feet; that the speed of the locomotive was 12 miles an hour; that it was stopped in 72 feet 5 inches; and that no warning was given by bell or whistle.

Witness Grant testified he left Pritt on the track about 18 to 20 feet west of the east side of said pier when he started across the bridge to check the men on the Illinois side. He testified at different places in the record that he had walked 30 feet, 30 or 40 feet east of the pier, and 60 feet east of where he left Pritt when he saw the locomotive 250 to 300 feet east of where he left Pritt, traveling west. He stopped on the walkway and the locomotive passed. He could not estimate its speed. He testified Owen, on the scaffold, knocked a board (2 x 8 inches by 4 feet) out of the false work with a sledge hammer, and it went "a-flying" over Pritt's head and landed on the track about 8 feet west of Pritt; but he also testified he did not see the board fall; he did not know a board had fallen; he was walking east with his back to the men; and "guessed" he was 30 feet east by the time the board was knocked off. He testified he "seen him

[Pritt]," and "saw him standing there" and "he was there until he was killed." However, on cross-examination it developed that Grant was narrating what "Owen told me"; "He saw it"; "Said he did." The last Grant saw of Pritt alive was when Grant started walking east. He did not look back west, and does not know of his own knowledge how the accident happened. Defendant's attempt to impeach witness Grant by showing he had stated he did not know how the accident happened et cetera was terminated thus:

"The Court: That wouldn't be inconsistent with anything Grant said. Grant said he didn't see it.

"Mr. Koenig [plaintiff's counsel]: That is right. * * Grant said he didn't see it. He walked away.

"The Court: He said two or three times that he didn't see it. * * That is not inconsistent with anything he testified to. He said—Grant testified himself he didn't know how it occurred."

Luther Owen testified to the following effect: He never attended school. He was on a scaffold over the track east of the pier removing the false work. He said Pritt was east of the scaffold 6 or 7 feet, toward East St. Louis. (Plaintiff's counsel thought Owen was confused.) He knocked a board off the false work and it went over Pritt toward St. Louis, which would place Pritt west of him; but he also testified the board went over Pritt's head toward East St. Louis. Plaintiff's brief stresses Owen's testimony on rebuttal that Owen saw Pritt on the track "a split second" before the locomotive passed over the spot. Owen did not hear or see the locomotive until it was "right under me." The scaffold had been so erected as not to interfere with train movements, and one could not work comfortably thereon because one had to work in a crouched position. According to Owen, he worked down on one knee and when in that position his height was 44 inches. He testified his body above the bottom of his breast bone, that is, the top 21 inches of his body, was at all times while on the scaffold above the bottom of and between the I-beams supporting the upper deck of the bridge. Owen testified he was facing south and Pritt was within his view when he looked down; that Pritt was picking up or reaching for the board and in "about a split ▇▇▇ second," "a split second" the locomotive passed over the spot; that Pritt "walked down there to pick it up"; that when the locomotive passed under witness, Pritt "must've been picking the board up. He didn't have time to get anywhere else"; "* * * I didn't see the train hit him."

"The Court: What I asked you was, how far was the front of the locomotive from Pritt the last time you saw Pritt? A. I never saw the locomotive at all until it passed by. Pritt wasn't there then. * * *

"The Court: Did you see him? A. The last time I seen Pritt he was picking the board up, and I got back off the scaffold.

"The Court: Where was the locomotive then? A. I don't know. I didn't know until it went by."

On cross-examination Owen testified, among other things, that he saw Pritt reach for but did not see him pick up the board; that he did not know there had been an accident and he kept on working for five minutes or more; that he did not see the locomotive stop; "Q. And the truth of the business is, you never thought about Pritt being hurt, did you? A. No." The first Owen knew of an accident was when an iron worker hollered up: "There is a man got killed, come on down." Owen "thought maybe that somebody fell into the river" and he "did not think a man had been hit by an engine"; he "had no idea what had happened."

Owen was questioned concerning certain statements made to defendant's representative. He testified he stated Pritt had been dragged 20 feet; that he did not make that statement; that he said it was about 100 feet; and in connection therewith: "Q. You didn't see where he got hit? A. No. Q. So you wouldn't know? A. No." Also:

"Q. All right. (Reading) 'I did not see this accident happen.' That is correct, isn't it? A. I never seen the engine hit the man, that is right.

"Q. That is what I mean. Well, then, you didn't see the accident happen and you told the Terminal man that, didn't you? A. That is right.

"Q. (Reading) 'And I do not know how this accident happened because I did not see it.' A. That is right.

"Q. And you told him that, too didn't you? A. Yes, sir.

"Q. (Reading) 'And I do not know of anybody that did see this accident happen.' A. That is right.

"Q. And you don't know yet of anybody who saw it, do you? A. No, sir."

Pritt's body, after the accident, was placed at different points but for the purpose of this review is taken as being about 28 feet west of the M. S. office. Defendant points to inconsistencies in this connection in the testimony of Grant and of Owen but we see no occasion for developing them.

Plaintiff says the testimony of the engineer and the fireman aided her case. We think not. Fireman Thorne B. Simmons was plaintiff's witness. She stresses his testimony that he saw a man cross from the south to the north of track 72 at a point west of the M. S. office while the locomotive was about 300 feet east of the man; that the man walked out of witness' sight going north at the west end of the M. S. office, and that was the last he saw of him. He saw no other person around there.

Locomotive engineer Rudolph O. Wehrheim testified the Diesel was proceeding west over track 72 at about 12 miles an hour; that the

locomotive overhangs the rail about 18 inches; that when he first saw Pritt, Pritt was about 2 feet north and 5 feet west of the engine, having stepped out very suddenly about 4 or 5 feet west of the west end of the M. S. office, walking south toward track 72; that witness immediately opened the sander, applied the brakes and stopped the locomotive in 72 feet 5 inches.

Defendant first claims it owed Pritt no duty until Pritt was actually discovered in a position of imminent peril because it was Pritt's duty to watch for trains and to warn Owen of their approach; and, since there was no evidence defendant's enginemen actually discovered Pritt in a position of imminent peril in time to avoid injuring him, that plaintiff may not maintain [123] a humanitarian case on constructive notice or discoverable peril. Karr v. Chicago, R. I. & P. Ry. Co., 341 Mo. 536, 108 S. W. 2d 44, 48, 49; and Southern Rd. Co. v. Drake, 166 Ala. 540, 51 So. 996, stressed by defendant, do not establish error. The Karr case involved an injury to an employee of the defendant whose duties embraced the protection of a highway-railroad grade crossing that defendant's trains might have a clear track and to look out for his own safety. The Drake case involved an injury to a trespasser upon defendant's tracks. In each case the railroad owed the person no duty unless its employees actually discovered his peril in time to avert the injury. The duty Pritt owed Owen to watch for approaching trains was not a duty owed defendant. A sign at each end of the bridge read: "Bridge Under Construction." The work had been in progress for a number of months. Under this record Pritt was a business invitee to whom defendant owed the duty of ordinary care, and was not a trespasser, a mere naked licensee or an employee of defendant. Willig v. Chicago, B. & Q. Rd. Co., 345 Mo. 705, 137 S. W. 2d 430, 435; Savage v. Chicago, R. I. & P. Ry. Co., 328 Mo. 44, 40 S. W. 2d 628, 631[1-3].

For her humanitarian case plaintiff relies upon her witness Grant to establish that Pritt remained in the "middle of the track" after Grant started east and until he was killed, and thus was in view of the enginemen while the locomotive was 300 feet east of Pritt and 17 seconds from the point of impact, moving at 12 miles an hour. This would unduly extend the doctrine which, under the instant facts, is of narrow scope in distance and time. The basic factor of a humanitarian case is plaintiff's imminent or impending peril. State ex rel. v. Trimble, 300 Mo. 92, 253 S. W. 1014, 1018[3]. The peril must be something more than a bare possibility of injury. It means a certain, immediate and impending peril and not a contingent danger. State ex rel. v. Trimble, supra; Baker v. Wood (Mo.), 142 S. W. 2d 83, 84[2]; State ex rel. v. Bland, 354 Mo. 868, 191. S. W. 2d 660; Huckleberry v. Missouri Pac. Rd. Co., 324 Mo. 1025, 1034, 26 S. W. 2d 980, 983; Stewart v. Mo. Pac. Rd. Co., 308 Mo. 383, 272 S. W. 694, 696.

This record calls for the application of the rule to the effect that if the testimony of a given witness to prove an issue for the party having the burden is conflicting and contradictory, one version tending to prove the issue and the other tending to disprove it, with no reasonable excuse or explanation of the contradiction, and no other fact or circumstance in the case tending to show which version of the witness' testimony is true, no case is made by the witness' testimony, as one contradictory statement cancels the other; and the jury should not be permitted to speculate or guess which of the contradictory statements should be accepted. Steele v. Kansas City So. Ry. Co., 265 Mo. 97, 115, 175 S. W. 177, 181.; Adelsberger v. Sheehy, 332 Mo. 954, 961[5, 6], 59 S. W. 2d 644, 647[6-8]; Draper v. Louisville & N. Rd. Co., 348 Mo. 886, 156 S. W. 2d 626, 633[11, 12]; State v. McCrackin (Mo.), 162 S. W. 2d 853, 854[2]; Stevens v. Thompson (Mo. App.), 175 S. W. 2d 166, 169[3].

Witness Grant's explanation of the inconsistencies in his testimony established that he personally did not see the accident or know how it occurred but that Owen said he saw it and told witness. The court and plaintiff's counsel so understood his testimony. In harmony with this explanation is Grant's further testimony that when he left Pritt and started east he, Grant, never looked back west and never saw Pritt alive thereafter. In these circumstances under the authorities plaintiff may not rely, as she does, upon Grant's testimony as to how the accident occurred and to establish that Pritt remained upon the track until he was killed, and this presentation of the issue cannot be sustained.

Plaintiff's witnesses clearly established that Pritt did not remain on the track after Grant left him. Her witness Simmons saw Pritt crossing the track from the south to the north and disappearing behind the west wall of the M. S. office when the locomotive was 300 feet away.

Plaintiff also argues that the last time Owen saw Pritt alive Pritt was on the track stooping over and reaching for the board and "a 'split second' later the train ran over his position. So, less than a second before he was killed, decedent was certainly oblivious of the approach of the train." Plaintiff also argues, again relying upon Grant, that Pritt's movement between the two rails within a space of 100 feet east and west manifested his obliviousness. This argument based upon Grant's testimony, as hereinbefore pointed out, cannot be sustained.

Giving consideration to Owen's testimony, it did not furnish any probative evidence of Pritt's obliviousness in time to stop the locomotive after the permissible presumption that Pritt would step off the track ceased to exist. The evidence most favorable is that on which plaintiff argues the issue: A speed of 12 miles an hour and a stop in 72 feet 5 inches. It took approximately 4 seconds to stop. Pritt

could have entered upon and crossed the 4 foot 8-½ inch gauge track in considerably less time, or could have stepped off more quickly if on it. We have ruled many times that if a locomotive engineer sees an adult person on a railroad track, unless there is something in his actions or manner to indicate the contrary, the engineer has the right to assume that such person will step off to a place of safety. This assumption is an assumption that the person is not oblivious until he shows reasonable appearances of obliviousness. Plaintiff failed to carry the burden of establishing Pritt's obliviousness and its manifestation for a sufficient length of time to permit of the enginemen's duty to stop under the humanitarian doctrine. Poague v. Kurn, 346 Mo. 153, 140 S. W. 2d 13, 17 [5-7]; Clark v. Atchison, T. & S. F. Ry. Co., 319 Mo. 865, 6 S. W. 2d 954, 961; Womack v. Missouri Pac. Rd. Co., 337 Mo. 1160, 88 S. W. 2d 368, 371[6]; State ex rel. v. Reynolds, 289 Mo. 479, 233 S. W. 219, 222[3]; Hanks v. Anderson-Parks, Inc. (Mo. App.), 143 S. W. 2d 314, 317[2]; Thomasson v. Henwood, 235 Mo. App. 1211, 146 S. W. 2d 88, 93.

However, Owen placed Pritt on the track a short time prior to his stooping and reaching for the board, walking down the track to pick up the board, and while of the opinion plaintiff failed to make a submissible case on defendant's duty to stop, we may not say that the record discloses error in submitting the issue of defendant's duty to warn under the humanitarian doctrine or that it discloses that plaintiff may not make a submissible case on said issue upon a retrial. Consult State ex rel. v. Shain, 349 Mo. 27, 36, 159 S. W. 2d 582, 586[6-9]; Rentfrow v. Thompson, 348 Mo. 970, 975, 156 S. W. 2d 700, 703 [10].

The complaint that instruction No. 1 assumed certain facts is overruled because the subsequent assumption of a fact theretofore in the instruction required to be found is not error. Connole v. East St. Louis & S. Ry. Co., 340 Mo. 690, 102 S. W. 2d 581, 591[30], and cases cited.

Complaint is made of the refusal of an instruction to the effect, briefly stated, that defendant's engineer had a right to assume Pritt would heed the bell of the locomotive, if ringing, unless and until something in the conduct of Pritt indicated the contrary. Plaintiff says the facts did not warrant the instruction. The propriety of the instruction is to be determined in the light of the evidence favorable to defendant, including plaintiff's evidence, if any, and not the evidence plaintiff relies upon to establish her case; and plaintiff's stated reason is insufficient to justify the refusal of the instruction. Defendant was entitled to an instruction of this nature. Clark v. Atchison, T. & S. F. Ry. Co., 319 Mo. 865, 6 S. W. 2d 954, 961 [16, 17]; Kenefick v. Terminal Rd. Ass'n (Mo.), 207 S. W. 2d 294, 298; State ex rel. v. Reynolds, supra; State ex rel. v. Shain, supra.

The judgment should be reversed and the cause remanded for the reasons stated. It is so ordered. *Westhues* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C. is adopted as the opinion of the court. All the judges concur.